requirements. In *Matter of "Female" D.* (83 AD2d 933), we held that section 111 (subd 1, par [e]) of the Domestic Relations Law is constitutional. Inasmuch as the father does not meet the three criteria established by the amendment, to wit, he has not lived openly with the child or the child's mother for a continuous period of six months immediately preceding the placement of the child for adoption, he has not openly held himself out to be the father of the child during that period, and he has not paid a fair and reasonable sum in accordance with his means for medical, hospital and nursing expenses incurred in connection with the mother's pregnancy or with the birth of the child, his consent to the adoption is not required. The Legislature has determined, in response to *Caban v Mohammed* (441 US 380), that an unwed father must show that he has offered at least minimal support to the mother and child and created some semblance of a family unit before his consent will be required for the adoption of an infant placed for adoption before the age of six months. Where an unwed father has failed to provide this stability and support, as evinced by compliance with the requisite statutory criteria, it is in the interests of the infant, of the society in which the infant will live, and of the unwed mother, if she consents, to have the child adopted into a home where such stability and support will be provided. Gibbons, J.P., Gulotta, Cohalan and Bracken, JJ., concur.

■ In the Matter of "FEMALE" D. THOMAS BYRD W. et al., Appellants; CAROL D. et al., Respondents. — In a private placement adoption proceeding, the prospective adoptive parents appeal from an order of the Surrogate's Court, Nassau County (Bennett, S., at the trial; Delin, S., on the decision; Radigan, S., on the order), dated February 4, 1981, that, *inter alia,* (1) held section 111 (subd 1, par [e]) of the Domestic Relations Law to be unconstitutional as applied to the natural father herein and adjudged that his consent to the adoption was required, (2) vacated the previously given consent of the natural mother on the ground of duress, and (3) dismissed the adoption proceeding. Order modified, on the law and the facts, by deleting all decretal paragraphs except the first and substituting therefor provisions (1) denying the application, *inter alia,* to vacate the consent of the natural mother and (2) declaring section 111 (subd 1, par [e]) of the Domestic Relations Law to be constitutional. As so modified, order affirmed, without costs or disbursements and proceeding remitted to the Surrogate's Court, Nassau County, for further proceedings consistent herewith. The infant who is the subject of this proceeding was born on October 21, 1976. Her mother, Carol, was 15 years old at the time and was unwed. The father of the infant was 19 years old. Neither of the natural parents has ever seen the child, who was surrendered to the prospective adoptive parents on October 26, 1976 pursuant to the signed consent of the natural mother. The infant has resided with those parents to the present time. In August, 1977 the natural parents (who had married out-of-State during the preceding June) appeared in this proceeding to finalize the adoption. They subsequently moved, *inter alia,* to set aside the consent of the natural mother on the ground that it had been procured by coercion, duress and fraud. However, no issue was therein raised regarding the constitutionality of the then-governing statute (Domestic Relations Law, § 111, as it read prior to its amendment by L 1980, ch 575), which, as written did not require the preadoption consent of an unwed father. Hearings on the motion to set aside the consent began during November of 1978 and the matter was submitted for decision on March 22, 1979. On April 24, 1979 the Supreme Court of the United States declared the New York gender-based consent provision of the Domestic Relations Law to be unconstitutional *(Caban v Mohammed,* 441 US 380), whereupon the natural father moved for summary judgment dismissing

the adoption petition. Hearings were held on the motion from October, 1979 through July 1, 1980, when the matter was again submitted for decision. Upon the retirement of the Surrogate who had presided at those hearings, a decision was rendered by the Acting Surrogate pursuant to SCPA 209 (subd 8 [now subd 9]). Before that decision was rendered, however, the Legislature amended the Domestic Relations Law to require the preadoption consent of an unwed father, but only under certain circumstances (see Domestic Relations Law, § 111, subd 1, pars [d], [e], as amd by L 1980, ch 575). The Acting Surrogate ruled in favor of the natural parents and, *inter alia,* vacated the consent and dismissed the adoption proceeding. Appellants, the adoptive parents, first contend that the statute relied upon by the Acting Surrogate as authority to render the decision (SCPA 209, subd 8 [now subd 9]) is an historical anachronism which was never meant to apply to the situation at bar and must give way to section 21 of the Judiciary Law. Appellants did not, however, raise this objection before the Acting Surrogate at the time that the decision was rendered. Under the present circumstances, we view this failure to object as a waiver. In addition, we note that the subdivision in question was specifically renumbered by the Laws of 1980 (ch 503, § 5), and that the Legislature may therefore be presumed to have been well aware both of the existence and the content of that subdivision when it renumbered it, i.e., the investure of power in the Surrogate's Court "[t]o determine any unfinished business pending before its predecessor in office and to sign or certify papers or records left uncompleted or unsigned by its predecessor." Turning to the issue of the natural mother's consent, we conclude upon the record considered as a whole that her claim, *inter alia,* that her consent was coerced is contrary to the weight of the credible evidence. The following two examples are illustrative of the reasons why the natural mother's testimony in this regard is not to be believed. Carol testified at the hearing that no one had advised her that she did not have to give up her child. However, the testimony of a disinterested witness, social worker Lenore Heiler, and the notes which Heiler made of her interviews with the natural mother, make it clear that Carol was well apprised of the alternatives to adoption (i.e., keeping the infant and living with her parents; keeping the infant and marrying the natural father [Jesus]; or placing the infant in foster care), and that, upon consideration of the alternatives, she reached the decision to place the child for adoption. Notably, the testimony of Carol's two aunts corroborates that of Heiler in several important respects. Second, Carol testified, *inter alia,* that she did not know that she was signing a consent to adoption, and that she was told by Mr. Land (the attorney for the prospective adoptive parents) and her mother (both of whom she trusted) that she was merely signing a consent to place the child in foster care for a period of two years — until she could get herself straightened out. Although she identified her signature on three papers relating to her consent to the adoption (including an "Agreement of Adoption"), all dated October 26, 1976, Carol testified under oath that she had never seen any of these papers prior to the commencement of this proceeding. In our view, this testimony, when viewed upon the record as a whole, represents a rather obvious attempt to put a false face upon that which was, in reality, a freely given consent to adoption. Moreover, the present claims of duress and/or coercion are entirely inconsistent with the claim of the natural mother that she had willingly signed the consent to adoption because she thought that she was signing a consent to foster care. Thus, the evidence is overwhelming that Carol was well aware of the nature of the documents which she was signing. Finally, we have concluded that the efforts of Carol's mother to keep Carol isolated from the father and one of her girlfriends do not tip the scales in favor of the natural parents on the issue of duress. We note that when the question of Carol's "imprisonment"

was directly raised with her by the social worker (Lenore Heiler), as a result of a telephone call from Jesus' sister, Carol explicitly denied that she had been "imprisoned." Moreover, Carol's testimony was to the effect that during the month preceding the infant's birth she had spoken with Jesus on the telephone, perhaps as many as 10 times. In short, the record, when viewed as a whole, amply supports the conclusion that Carol was a headstrong young woman who, had she chosen to go against her mother's wishes regarding the adoption of the infant, would clearly have done so — just as she had ignored her parents' wishes respecting Jesus. On the third issue before us, we hold that section 111 (subd 1, par [e]) of the Domestic Relations Law (added L 1980, ch 575) is constitutional. The amendment provides, in effect, that the preadoption consent of the unwed father of an infant under the age of six months is not required where the father has failed to satisfy such legislatively prescribed criteria as are intended to demonstrate that the newborn infant has a functioning male parent (and, therefore, a *de facto* family) available to him or her. Thus, where the unwed father is available to the child through his presence and his financial support (see Domestic Relations Law, § 111, subd 1, par [e]), the father is afforded a voice regarding the adoption of the infant and his consent is required. Where, however, the unmarried father does not meet these criteria, the adoption may go forward merely upon the consent of the mother. In our view, the foregoing statutory scheme effectively promotes the adoption of illegitimate newborns into stable adoptive families. The statute requires the consent of *both* parents where a *de facto* family unit has been created through the efforts of the natural father but, at the same time, precludes an absentee biological father from frustrating the attempts at adoption undertaken by the natural mother in the perceived best interests of the child where she is the only parent available to it. Thus, the statute "'serve[s] important governmental objectives and [is] *** substantially related to [the] achievement of those objectives'" *(Califano v Webster,* 430 US 313, 316-317, quoting *Craig v Boren,* 429 US 190, 197). It therefore satisfies the constitutional test for a gender-based classification. Whether or not other criteria might also serve the purpose of demonstrating that an unwed father is available to his infant so that the father's preadoption consent should be required need not concern us here (see *Caban v Mohammed,* 441 US 380, 393, n 13, *supra; Lalli v Lalli,* 439 US 259, 274). Contrary to the Surrogate's conclusion, the failure of Jesus to satisfy the statutory criteria does not render the statute unconstitutional (cf. *Vance v Bradley,* 440 US 93, 108). It does, however, permit the adoption to go forward without his consent. In view of the foregoing, we need not reach appellants' alternate contention, i.e., that the natural parents abandoned the child and thereby rendered their consents unnecessary (see Domestic Relations Law, § 111, subd 2, par [a]). Accordingly, the adoption proceeding is to continue. Gulotta, Cohalan and Bracken, JJ., concur.

Gibbons, J.P., dissents and votes to affirm the order, with the following memorandum: In this case a young couple, happily married for over four years, has sought, perhaps with youthful inexperience but with ample enthusiasm and considerable expense, custody of their own child. Except for the quite understandable faltering of the natural mother, under what had to have been enormous pressure for a 15 year old, the natural parents have diligently pursued all reasonable approaches to obtain custody of their baby. Moreover, a substantial question of constitutional dimensions is presented concerning the due process rights of the father. For the reasons set forth in the decision of Judge Delin, the Acting Surrogate of Nassau County, I vote to affirm.