In the Matter of RAQUEL MARIE X., an Infant. MR. AND MRS. C., Appellants; MR. AND MRS. T., Respondents.

Second Department, September 11, 1989

### APPEARANCES OF COUNSEL

*Alan D. Scheinkman,* and *Fink, Weinberger, Fredman, Berman, Lowell & Fensterheim, P. C. (Alan D. Scheinkman* and *Ronald J. Bavero* of counsel), for appellants.

*Domenick J. Porco* for Mr. T., respondent.

*Richard S. Birnbaum* for Mrs. T., respondent.

*Richard J. Strassfield, Law Guardian,* for Raquel Marie X.

*Robert Abrams, Attorney-General (Robert J. Schack* of counsel), in his statutory capacity under Executive Law § 71.

### OPINION OF THE COURT

Per Curiam.

In this appeal from the denial of an adoption petition, we are confronted with the question of whether the consent of the natural father to the proposed adoption of the infant child Raquel Marie is required pursuant to Domestic Relations Law § 111 (1) (e). Based upon the following discussion, we conclude that it is not.

Raquel Marie's natural parents first met in 1983 or 1984 while both were attending high school. A tumultuous relationship followed. On August 10, 1986, the natural mother gave

birth to a daughter, Lauren Louise. Shortly thereafter, the unmarried couple began to discuss the idea of living together, inasmuch as they were residing in the homes of their respective parents at the time. However, they did not begin to cohabit until mid or late April 1987, when they and Lauren took up residence in an apartment. The cohabitation was short-lived, for in late May 1987 certain rumors arose concerning the purported infidelity of the natural father, prompting the natural mother to vacate the premises and return to her parents' home with Lauren. The natural father likewise returned to the home of his parents, and the couple continued to see each other sporadically. In the summer of 1987, the natural mother procured an abortion without telling the natural father. This action greatly angered the natural father. In October 1987, the couple learned that the natural mother was again pregnant. Their relationship deteriorated, and the natural mother obtained an order of support due to the natural father's failure to properly provide for Lauren, as well as numerous orders of protection necessitated by the violent conduct of the natural father. The natural mother also accused the natural father of raping her and, due to his repeated assaults on her person and his violation of orders of protection, filed at least three separate criminal complaints against him.

Raquel Marie, the child who is the subject of the instant adoption proceeding, was born on May 26, 1988. Her birth certificate did not set forth the name of her natural father. Her natural parents remained unmarried and were not cohabiting at the time of her birth. For approximately one week after the child's birth, the natural father "was spending the nights" with the natural mother at an apartment in which she had taken up residence. However, as the natural father conceded at the hearing, he did not continue this practice because "we were arguing, and I thought it wasn't safe to stay there at night".

When Raquel Marie was approximately one month old, the natural mother placed her with the Spence-Chapin Agency for adoption, claiming that she was unable to care for two children. At the natural father's insistence, the child was retrieved from the agency. However, on July 22, 1988, the natural mother executed a consent to adoption and surrendered Raquel Marie to an attorney. The attorney then gave the child to the proposed adoptive parents, with whom the child has resided ever since. On July 19, 1988, the natural

father had commenced a custody proceeding against the natural mother. An order of filiation was entered upon his consent on August 19, 1988. Although the natural parents had discussed marriage on numerous occasions in the past, they did not marry until November 4, 1988, and the natural mother then joined in the natural father's attempt to obtain custody of Raquel Marie. The proposed adoptive parents then commenced this proceeding in January 1989 to finalize the adoption. The natural parents opposed the petition and sought the return of the child, essentially contending that the natural father's consent to the adoption was required and had not been obtained, and that the consent of the natural mother to the adoption was invalid. The Family Court, Westchester County, directed that a hearing be held to resolve the dispute. The court bifurcated the hearing, limiting the evidence solely to the issue of whether the natural father's consent to the adoption was necessary.

At the conclusion of the hearing, the Family Court rendered a decision which accurately characterized the natural parents' relationship as one which was turbulent, marred by mutual suspicion as well as assaultive behavior on the natural father's part, and neither normal nor stable. However, the court concluded that the natural father had sufficiently met the requirements of Domestic Relations Law § 111 (1) (e) and therefore, his consent to the adoption was necessary. Inasmuch as such consent was never obtained, the court denied the petition for adoption. We now reverse.

At one time, an unwed father in New York had no right to veto an adoption to which the biological mother had consented. In *Caban v Mohammed* (441 US 380), the United States Supreme Court declared the predecessor statute of Domestic Relations Law § 111 unconstitutional insofar as it created a gender-based distinction violative of the Equal Protection Clause by requiring only the consent of the mother for an adoption. In response to *Caban v Mohammed (supra)*, the New York State Legislature amended Domestic Relations Law § 111 in 1980, thereby granting unmarried fathers certain veto rights with regard to adoptions in particularized circumstances and when certain conditions have been met. The legislative history underlying the amendment demonstrates that the criteria set forth in Domestic Relations Law § 111 (1) (e), which are applicable herein, are to be considered mandatory rather than permissive *(see,* 1980 NY Legis Ann, at 242). Accordingly, with respect to children who are born out of

wedlock and placed for adoption less than six months after birth, Domestic Relations Law § 111 (1) (e) provides as follows:

"Subject to the limitations hereinafter set forth consent to adoption shall be required as follows * * *

"(e) Of the father, whether adult or infant, of a child born out-of-wedlock who is under the age of six months at the time he is placed for adoption, but only if: (i) such father openly lived with the child or the child's mother for a continuous period of six months immediately preceding the placement of the child for adoption; and (ii) such father openly held himself out to be the father of such child during such period; and (iii) such father paid a fair and reasonable sum, in accordance with his means, for the medical, hospital and nursing expenses incurred in connection with the mother's pregnancy or with the birth of the child."

The foregoing provision serves the salutary purpose of ensuring that the consent of an unmarried father to an adoption will be required where a meaningful family relationship has been established. Conversely, as we noted in *Matter of "Female" D.* (83 AD2d 933, 935): "the preadoption consent of the unwed father of an infant under the age of six months is not required where the father has failed to satisfy such legislatively prescribed criteria as are intended to demonstrate that the newborn infant has a functioning male parent (and, therefore, a *de facto* family) available to him or her". Indeed, the statutory requirements of Domestic Relations Law § 111 (1) (e) are not to be taken lightly, for: "[t]he Legislature has determined * * * that an unwed father must show that he has offered at least minimal support to the mother and child and created some semblance of a family unit before his consent will be required for the adoption of an infant placed for adoption before the age of six months. Where an unwed father has failed to provide this stability and support, *as evinced by compliance with the requisite statutory criteria,* it is in the interests of the infant, of the society in which the infant will live, and of the unwed mother, if she consents, to have the child adopted into a home where such stability and support will be provided" *(Matter of Michael Patrick C.,* 83 AD2d 932, 933 [emphasis supplied]). Put another way, "[the] statute * * * only requires the consent of those fathers of children born out of wedlock who have established a substantial relationship with the child" *(Matter of Catholic Child Care Socy. [Danny R.],* 112 AD2d 1039, 1041).

With respect to the present case, we initially reject the natural parents' suggestion that Domestic Relations Law § 111 (1) (e) is constitutionally flawed. We have previously upheld this provision as constitutional in *Matter of "Female" D. (supra)* and *Matter of Michael Patrick C. (supra)*. Indeed, in *Matter of "Female" D. (supra,* at 935), we elaborated on the constitutionality issue as follows: "where the unwed father is available to the child through his presence and his financial support (see Domestic Relations Law, § 111, subd 1, par [e]), the father is afforded a voice regarding the adoption of the infant and his consent is required. Where, however, the unmarried father does not meet these criteria, the adoption may go forward merely upon the consent of the mother. In our view, the foregoing statutory scheme effectively promotes the adoption of illegitimate newborns into stable adoptive families. The statute requires the consent of *both* parents where a *de facto* family unit has been created through the efforts of the natural father but, at the same time, precludes an absentee biological father from frustrating the attempts at adoption undertaken by the natural mother in the perceived best interests of the child where she is the only parent available to it. Thus, the statute ' "serve[s] important governmental objectives and [is] * * * substantially related to [the] achievement of those objectives" ' *(Califano v Webster,* 430 US 313, 316-317, quoting *Craig v Boren,* 429 US 190, 197). It therefore satisfies the constitutional test for a gender-based classification". Inasmuch as Domestic Relations Law § 111 (1) (e) provides logical, objective and eminently sound indicia by which to determine whether an unmarried father has manifested the intent to establish a substantial familial relationship with an infant born out of wedlock, we discern no basis for departing from the above-expressed view.

Turning to the facts of the instant case, we conclude, contrary to the findings of the Family Court, that the natural father has fallen far short of demonstrating that he took meaningful steps to establish a family unit. Our analysis of his compliance with Domestic Relations Law § 111 (1) (e) need not extend beyond the first statutory criterion (i.e., the requirement that he openly live with the child or the child's mother for a continuous period of six months immediately preceding the child's placement for adoption). Indeed, as conceded by the natural father's attorney at the hearing before the Family Court, there was no such cohabitation during the six-month period prior to Raquel Marie's placement except for

a one-week interval following the child's birth. Moreover, the biological father's contact with the biological mother during the entire six-month period was sporadic and often culminated in violent and abusive behavior. Additionally, while it is unnecessary for us to consider the criteria set forth in Domestic Relations Law § 111 (1) (e) (ii) and (iii), regarding public acknowledgment of paternity and acceptance of the financial responsibilities which accompany fatherhood, we note that little evidence of compliance with these requirements was adduced by the natural father in this case. Accordingly, we need not presently decide the issue of whether and under what circumstances something less than 100% compliance with the criteria set forth in Domestic Relations Law § 111 (1) (e) may satisfy the statute and require an unmarried father's consent to an adoption. The record overwhelmingly demonstrates that, even under a relaxed interpretation of the statute, the natural father's efforts to establish a substantial family relationship in this case were woefully inadequate.

We further note that the reliance of both the natural father and the Family Court upon the decision in *Matter of Baby Girl S.* (141 Misc 2d 905, *affd without opn* 150 AD2d 993) is misplaced. In that case, an adoption proceeding was dismissed on the ground of fraud and misrepresentation. No similar issue is presently before us. While the decision in *Matter of Baby Girl S. (supra)* went on to state that the requirement of strict compliance with the criteria set forth in Domestic Relations Law § 111 (1) (e) would work an unconstitutional result where the natural mother rebuffed the natural father's repeated efforts to establish a substantial family relationship, that discussion constituted mere dicta. Moreover, the First Department's affirmance without opinion of the Surrogate's Court's decision and order in that case does not constitute appellate authority for the analysis set forth therein. Most significantly, there is simply no persuasive evidence in the record before us to demonstrate that the natural father in this case made every effort to establish a substantial family relationship, or that any such purported efforts were thwarted by improper behavior on the part of the natural mother. While the natural mother may have exhibited some reluctance to see the natural father on certain isolated occasions, such reluctance is hardly surprising given his domineering, violent and assaultive conduct. Moreover, he

failed to demonstrate any genuine effort to overcome her reluctance *(see generally, Matter of Emily Ann,* 137 Misc 2d 726). Hence, inasmuch as he has failed to fulfill the statutory criteria, we conclude that the natural father's consent to the proposed adoption of Raquel Marie is unnecessary *(see, e.g., Matter of "Female" D., supra; Matter of Michael Patrick C., supra).*

■ Only one other contention of the natural parents merits brief mention. They maintain that their marriage on November 4, 1988, more than five months subsequent to Raquel Marie's birth and more than three months after her placement for adoption, operates retroactively so as to require the biological father's consent to the proposed adoption. This contention is without merit. While the marriage of the parents of a child born out of wedlock serves to legitimatize the child *(see,* Domestic Relations Law § 24 [1]), it is nevertheless clear that the consent of the father is *automatically* required only for the adoption "of a child conceived or born in wedlock" (Domestic Relations Law § 111 [1] [b]). Where, as in the instant case, the adoptive child is neither conceived nor born in wedlock, the consent of the father will be required only if he can satisfy the criteria set forth in Domestic Relations Law § 111 (1) (d) or (e). Acceptance of the natural parents' present contention would render these latter statutory provisions meaningless and would create uncertainty in adoption proceedings by permitting unwed parents to marry at any point prior to an adoption being finalized and thereby acquire the power to veto the proposed adoption. Such a result is untenable in light of the clear statutory language. Accordingly, the petition for adoption was improperly denied on the ground that the consent of the natural father was required.

■ Finally, we note that the Family Court improvidently exercised its discretion in ordering a bifurcated hearing to determine whether the natural father's consent to the adoption was required, before receiving evidence on the question of the validity of the natural mother's consent, which was also in issue. Under *the facts and circumstances of this case,* we believe that it should be remitted to another Judge of the Family Court for a prompt hearing regarding the validity of the natural mother's consent to the adoption and resolution of any remaining issues.

BRACKEN, J. P., KUNZEMAN, SULLIVAN and BALLETTA, JJ., concur.

Ordered that the order is reversed insofar as appealed from, on the law, and the matter is remitted to the Family Court, Westchester County, for further proceedings on the petition for adoption in accordance herewith, before a different Judge.