*394 OPINION OF THE COURT
Kaye, J.
The focus of these appeals, involving the adoption of newborn infants, is Domestic Relations Law § 111 (1), which provides that — while an unwed mother’s consent is always required — an unwed father’s consent to the adoption of his under-six-month-old child is required only where he has openly lived with the child or the mother for six continuous months immediately preceding the child’s placement for adoption, openly acknowledged his paternity during such period, and paid reasonable pregnancy and birth expenses in accordance with his means (Domestic Relations Law § 111 [1] [e]). We conclude that the statutory requirement that the father openly live with the mother before the child’s placement for adoption neither legitimately furthers the State’s interest nor sufficiently protects the father’s, and that section 111 (1) (e) must therefore be declared unconstitutional.
While the facts in both cases have been developed at length elsewhere (see, Matter of Raquel Marie X., 150 AD2d 23; Matter of Baby Girl S., published in part at 141 Misc 2d 905, affd without opn 150 AD2d 993), only a few are pertinent to the present analysis.
Both cases are adoption proceedings involving out-of-wedlock children whose birth mothers executed consents to their adoption. The putative adoptive parents were strangers to the children. In each case the child is a girl now just two years old —Baby Girl S. was born on April 24, 1988, Raquel Marie on May 26, 1988. Baby Girl S. was placed for adoption by her mother on April 27, 1988, two days after her birth; Raquel Marie on July 22, 1988, two months after her birth. In each case, the biological parents did not live together for any *395 sustained period of time prior to the child’s placement. However, after the initial estrangement during which each unwed mother sought adoption for the child — thus implicating the lives of hopeful adoptive parents — the biological parents reunited and the mother thereafter supported the father’s efforts to gain custody of the child. No question of fitness or abandonment is in issue.
In Raquel Marie, on November 4, 1988, approximately three months after the child was placed for adoption, the biological parents — Louise and Miguel — were married, but they do not have custody of the child, who has lived virtually her entire life with her adoptive parents in New Hampshire. The trial court, after a hearing limited to the issue of the need for Miguel’s consent under Domestic Relations Law § 111 (1) (e), concluded that while Louise and Miguel lived separately in the relevant six-month period before placement — during which he several times assaulted her — they had a sufficiently continuous and ongoing relationship to meet the "living together” requirement of the statute, loosely construed; the court additionally found that, in the key six-month period, Miguel had openly held himself out as the child’s father and contributed to the pregnancy and birth expenses, thus entitling him to veto the adoption.
The Appellate Division took a different view of the couple’s tumultuous relationship in the six months preceding placement, concluding that it was "neither normal nor stable.” (150 AD2d, at 26.) In that Miguel failed to satisfy the "living together” requirement of the statute, the Appellate Division determined that he had no right to veto the adoption. While the court explicitly premised its holding on Miguel’s failure to meet the "living together” requirement, it additionally observed that there was little evidence of Miguel’s compliance with the remaining two requirements of Domestic Relations Law § 111 (1) (e), or of any effort on his part to manifest substantial parental responsibility. Miguel’s appeal is before us as a matter of right, on a constitutional question (CPLR 5601 [b]).
In Baby Girl S., while the biological parents (Regina and Gustavo) also did not live together in the relevant six-month period preceding the child’s placement, the affirmed findings of the Surrogate established a course of conduct over several months that prevented Gustavo from even knowing of the pregnancy or his paternity, thus rendering literal compliance *396 with the statute impossible. The Surrogate, unanimously affirmed by the Appellate Division, concluded that the adoption should fail both because of fraud of the adoptive parents during the proceeding and because — reading a "savings clause” into the statute for prevention by others — Gustavo did as much as possible to fulfill the statutory requirements and therefore was entitled to veto the adoption. The Surrogate on November 15, 1988, ordered the child transferred from the adoptive parents to Gustavo, with whom she has since remained. After the Appellate Division affirmance, we granted the prospective adoptive parents’ motion for leave to appeal.
Concluding that the "living together” prong of Domestic Relations Law § 111 (1) (e) renders the statute unconstitutional, we now reverse the Appellate Division order in Raquel Marie; in Baby Girl S., we affirm on the statutory ground and affirmed findings of Gustavo’s substantial parental interest, without reaching the question of fraud on the part of the adoptive parents.[1]
The New York Statute Against the Backdrop of Five Supreme Court Cases[2]
Assessment of the New York statute and the parties’ claims regarding its validity can only be undertaken in the context of the five Supreme Court cases that have shaped the constitutional contours of the unwed father-child relationship.
*397 The evolution of the case law, and corresponding amendments of the New York statute, are themselves a commentary on changing family patterns and social attitudes toward unwed fathers (see generally, Note, Certainly Not Child’s Play: A Serious Game of Hide and Seek with the Rights of Unwed Fathers, 40 Syracuse L Rev 1055 [1989]; Raab, Lehr v Robertson: Unwed Fathers and Adoption — How Much Process is Due?, 7 Harv Women’s LJ 265 [1984]; Comment, Caban v Mohammed: Extending the Rights of Unwed Fathers, 46 Brooklyn L Rev 95 [1979]; Note, The Unwed Father’s Rights in Adoption Proceedings: A Case Study and Legislative Critique, 40 Alb L Rev 543 [1976]; Comment, The Emerging Constitutional Protection of the Putative Father’s Parental Rights, 70 Mich L Rev 1581 [1972]).
Until the 1970’s, unwed fathers had no legally recognized interest. That point is amply illustrated by the 1972 Supreme Court decision in Stanley v Illinois (405 US 645), where children born during a nonmarital cohabitation that spanned 18 years, under Illinois law became wards of the State upon their mother’s death.
Stanley established that a father’s interest "in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection” (id., at 651); the sense of the parental tie as a fundamental interest appears throughout the court’s opinions in this area. Illinois’ blanket assumption that all unwed fathers were unfit was found to have violated both equal protection and due process, which entitled Stanley to a hearing on “his fitness as a parent before the State could terminate his parental rights. The Supreme Court rejected the State’s claim that unmarried fathers could reasonably be presumed unqualified to raise their children, and recognized that a father in Stanley’s situation had a constitutional interest in his relationship with his nonmarital children entitled to the same protection against State interference as the interests of other custodial parents.
Following Stanley, the New York Legislature in 1976 added Domestic Relations Law § 111-a, for the first time requiring that an unwed father in enumerated circumstances be given notice of an adoption proceeding, which would then entitle him to present evidence relevant to the best interests of the child (L 1976, ch 665). Still an unwed father in New York had no right to veto an adoption to which the mother had consented.
*398 In 1978, relying on Stanley, Leon Quilloin sought the right to veto the adoption of his 11-year-old child by the boy’s stepfather. While Quilloin’s name appeared on the birth certificate, he never had custody, or regularly supported or visited the child, nor did he attempt to legitimate him until receiving notice of the proposed adoption. Rejecting Quilloin’s equal protection and due process claims, the Supreme Court identified the issue, unresolved by Stanley, as one of the degree of protection a State must afford "the rights of an unwed father in a situation, such as that presented here, in which the countervailing interests are more substantial.” (Quilloin v Walcott, 434 US 246, 248.)
Noting its long recognition that the relationship between parent and child is a constitutionally protected one, the court stated that it had little doubt that the Due Process Clause would be offended if the State were to attempt to break up a biological family over the objection of parents and children solely in the perceived best interests of the children. However, it found no violation in view of Quilloin’s failure to have or seek custody of his son, where the result of the adoption would be to give legal recognition to an existing family unit. The nature of Quilloin’s actual relationship with his son was also central to the court’s rejection of his equal protection claim. The court emphasized that he "never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child” (id., at 256) — a responsibility that a once-married father would have exercised during marriage — and the absence of such a relationship justified differential treatment.
Stanley involved an unwed father with actual custody of his children at the time the State attempted to terminate his parental rights, Quilloin an unwed father who had never had custody. Caban v Mohammed (441 US 380) — decided in 1979, just one year after Quilloin — concerned an unwed father who for several years, but no longer, had custody of his children. Under the New York law then in effect, he was entitled only to notice of the proposed adoption and an opportunity to present evidence on the children’s best interests.
A sharply divided Supreme Court struck down the New York statute on equal protection grounds, applying the intermediate level of scrutiny applicable to gender-based distinctions and concluding that the "undifferentiated distinction between unwed mothers and unwed fathers, applicable in all *399 circumstances where adoption of á child of theirs is at issue, does not bear a substantial relationship to the State’s asserted interests.” (Id., at 394.) Since Caban and his children had lived together as a family for several years, the "case demonstrates that an unwed father may have a relationship with his children fully comparable to that of the mother.” (441 US, at 389.) While agreeing the State had important interests in furthering the adoption of nonmarital children into "a normal, two-parent home” (id., at 391), the majority concluded that gender-based distinction of section 111 was too broad to be substantially related to this interest.
According to the State, a requirement of the consent of unwed fathers would impede the adoption process because they are often impossible to locate, whereas mothers tend to remain with their children. Specifically reserving the question whether such difficulties would justify different treatment concerning newborn adoptions, the majority found that in the case of older children, the State’s problem could be solved by a more finely drawn distinction, as in "cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child.” (Id., at 392.)
In an effort to bring New York’s statute into compliance with Caban, the Legislature in 1980 amended Domestic Relations Law § 111 (L 1980, ch 575; see, Sponsor’s Mem, 1980 NY Legis Ann, at 242-243). Rejecting proposals to require the consent of all unwed fathers, the Legislature opted to provide them with a veto right only in specified circumstances which in its view objectively and unambiguously manifested that, through his efforts, there was a substantial, continuous, meaningful family relationship available to the child. Recognizing a distinction between the adoption of newborns and older children, the Legislature set up one test for an unwed father’s veto right in the case of an under-six-month child (Domestic Relations Law § 111 [1] [e]) and a different test for an over-six-month child — requiring financial support, visitation and communication with the child (Domestic Relations Law § 111 [1] [d]). No exception is made in section 111 (1) (e) — as in section 111 (1) (d) — for prevention of the father’s efforts to satisfy statutory requirements, by the person having custody of the child. That is eásentially the statute before us today.
Twice since Caban, the Supreme Court has considered ques *400 tions relating to the unwed father-child relationship, although Domestic Relations Law § 111 (1) (e) was not in issue in either case. In 1982, in Lehr v Robertson (463 US 248), the court sustained New York’s notice statute — Domestic Relations Law § 111-a — in a case where the unwed father, seeking to block the stepfather’s adoption, had never during the child’s two years lived with her or the mother or provided financial support.
In Lehr, which rested solely on procedural due process grounds, the court in defining the father’s liberty interest characterized "the rights of the parents [as] a counterpart of the responsibilities they have assumed” (id., at 257), and emphasized that the court’s recognition of such rights had been, for the most part, in the context of a recognized family unit. Analysis of the previous three cases demonstrated the distinction between a mere biological connection and an actual relationship of parental responsibility. Commenting on the biological link, the court stated that its significance was "that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child’s development.” (Id., at 262.) As Lehr had never grasped the opportunity to form a relationship with his daughter, the due process issue was whether New York had given adequate procedural protection to his opportunity to do so, and the court concluded that it had.
As for Lehr’s equal protection claim, again emphasizing that "the existence or nonexistence of a substantial relationship between parent and child is a relevant criterion in evaluating both the rights of the parent and the best interests of the child” (id., at 266-267), the court held that the New York statutes did not operate to deny Lehr equal protection, because he (like Quilloin) had never established a substantial relationship with his child, and hence (unlike Caban) was not similarly situated with the child’s mother.
Finally, only last term in Michael H. v Gerald D. (491 US 110) the Supreme Court considered the constitutionality of the California statutory scheme governing the rights of a biological father of a child born to a woman married to and living with another man at the time of conception. While the efforts of the alleged biological father to *401 gain visitation were denied, five Justices, in concurrence and dissent, indicated that such a father might have a constitutionally protected liberty interest in his relationship with the child when the mother was married to another man at the time of birth. Even the author of the two-Justice plurality opinion noted that the court had previously assumed in Lehr that the Constitution might require that some protection be accorded the biological father’s opportunity to develop a relationship with the child, and left open the question whether there would be a different result if the marital parents did not wish to raise the child as their own. The four dissenters found that Michael H. had fully met the court’s test for constitutional protection — he not only had a biological connection but also had come forward to participate in the child’s rearing and shown a willingness to assume his parental responsibilities.
Thus, it is plain that within two decades the interest of unwed fathers in a relationship with their children has gained significant recognition in the law, and the dimensions of that interest are by now well defined. The protected interest is not established simply by biology. The unwed father’s protected interest requires both a biological connection and full parental responsibility; he must both be a father and behave like one (see, Bartlett, Re-Expressing Parenthood, 98 Yale LJ 293 [1988]). When an unwed father promptly commits himself to custody — signifying "provision for the physical and emotional needs of children, provision of guidance and direction to children, and living with children on a day-to-day basis” (Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v Robertson, 45 Ohio St LJ 313, 350 [1984]) — in adoption proceedings by strangers he is entitled to the constitutional due process and equal protection guarantees accorded other parents before his rights are terminated.
The Unwed Father’s Constitutional Interest In the Case of Newborns
In the case of a child placed for adoption at birth, the father can have no more than a biological connection to the child, there having been no chance for a custodial relationship. Protection of his parental interest would depend, then, upon recognition of a constitutional right to the opportunity to develop a qualifying relationship with the infant.
That open question is before us today: is the full measure of constitutional protection — the right to a continued *402 parental relationship absent a finding of unfitness — ever required where a child is placed for adoption before any real relationship can exist, and if so, what actions on the unwed father’s part would demonstrate his willingness to take parental responsibility sufficient to give rise to such rights? We conclude that such an interest must be recognized in appropriate circumstances, and we do so as a matter of Federal constitutional law; the parties’ exclusive reliance on Federal law affords us no basis for considering the issue under our own State Constitution.
In Caban, involving an unwed father who did not have a current custodial relationship with his children, the court gave determinative significance to the fact that he nonetheless had demonstrated a continuing willingness to have such a relationship. Conversely, in Lehr and Quilloin, rejecting the fathers’ claims that their relationships were also worthy of the maximum protection, the court emphasized their failure to grasp such opportunities for a significant relationship as had been available. Thus, it is apparent that the biological parental interest can be lost entirely, or greatly diminished in constitutional significance, by failure to timely exercise it or by failure to take the available legal steps to substantiate it.
Consequently, in an adoption proceeding by strangers, an unwed father who has been physically unable to have a full custodial relationship with his newborn child is also entitled to the maximum protection of his relationship, so long as he promptly avails himself of all the possible mechanisms for forming a legal and emotional bond with his child (see, Buchanan, The Constitutional Rights of Unwed Fathers Before and After Lehr v Robertson, 45 Ohio St U 313; see also, In re Adoption of B.G.S., 556 So 2d 545 [La 1990]; In re Baby Girl Eason, 257 Ga 292, 358 SE2d 459 [1987]). In Lehr in fact, Justice Stevens spoke of "the opportunity” the biological link offers the unwed father to develop an interest entitled to full constitutional protection (Lehr v Robertson, 463 US, at 262, supra). This implies, however, that in order to have the benefit of the maximum protection of the relationship — the right to consent to or veto an adoption — the biological father not only must assert his interest promptly (bearing in mind the child’s need for early permanence and stability) but also must manifest his ability and willingness to assume custody of the child (see, Buchanan, op. cit., 45 Ohio St LJ, at 362-368; see also, Note, Certainly Not Child’s Play: A Serious Game of Hide and *403 Seek with the Rights of Unwed Fathers, 40 Syracuse L Rev 1055, 1079-1084 [1989]).
Notably, in Lehr and Quilloin, the Supreme Court also emphasized that the result of permitting stepfather adoptions would be legal recognition of a de facto family already in existence, a State interest it viewed as outweighing the parental interests of the fathers who had not grasped the opportunity to solidify their relationships with their children. This State interest in recognizing the legal rights of a stepfather who has shouldered the parental role left open by the biological father’s failure to do so, is not present in the cases before us, involving proposed adoption by parties who were strangers to the children.
This is not to say that the unwed father’s failure to form ties with his newborn child may not be sufficiently great to constitute a sort of waiver or abandonment that would give rise to a State interest in providing the child with a permanent, stable home through adoption, as well as an interest on the part of prospective adoptive parents who have committed themselves to the child. The unwed father’s right is decidedly limited in duration. Nonetheless, a father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship.
The Relation Between the State Interest and the Private Interest
Where a fundamental interest of this nature is at issue, any legislation limiting or burdening it at the very least must meet two tests: the statute must further a powerful countervailing State interest, and there must be a close fit between the governmental objective sought and the means chosen to achieve it. These standards would apply whether the analysis were undertaken as a matter of due process or equal protection (see, Caban v Mohammed, 441 US 380, supra [equal protection]; Stanley v Illinois, 405 US ,645, supra [equal protection and due process]; see also, Matter of Malpica-Orsini, 36 NY2d 568, and especially 578 [Jones, J., dissenting], appeal dismissed sub nom. Orsini v Blasi, 423 US 1042).
Unquestionably, substantial State interests are at stake in *404 the adoption laws generally, and the consent provisions particularly (see, Matter of Malpica-Orsini, supra; see also, McCarthy, The Confused Constitutional Status and Meaning of Parental Rights, 22 Ga L Rev 975 [1988]). The distinctions drawn in Domestic Relations Law § 111 (1), based on parents’ gender and children’s age, reflect the inherently different position, alluded to by Justice Stevens in his Caban dissent, of an unwed mother alone faced with the enormous responsibility of making crucial decisions about the future of her newborn child. As the child grows older, the urgency underlying certain of those decisions arguably diminishes, and at that point there may be less justification for requiring the biological father’s participation rather than allowing him to fulfill his responsibilities through financial support and occasional visitation or communication, as contemplated by Domestic Relations Law § 111 (1) (d). Moreover, as Justice Stevens further noted, available statistics strongly indicate that infants are more likely to be adopted and more readily bond with adoptive parents. To the extent that the State has an interest in encouraging the adoption of these children, the statute promotes that end by limiting the necessity for paternal consent, thus making the process surer and speedier.
While the State cannot deny all unwed fathers who have never lived with their newborn children the right to veto adoption, plainly it can do a great deal to promote its own substantial interests, as well as the integrity of the adoption process. The State can deny a right of consent to all unwed fathers who do not come forward to immediately assume their parental responsibilities, and it can prescribe conditions for determining whether the unwed father’s manifestation of interest in his child is sufficiently prompt and substantial to require full constitutional protection (see generally, Note, Unwed Fathers and the Adoption Process, 22 Wm & Mary L Rev 85,135-137 [1980]).
Domestic Relations Law § 111 (1) (e) attempted to do precisely that. Indeed, the Legislature rejected an alternative proposal by the Law Revision Commission which envisioned according courts discretion to dispense with the unwed parent’s consent where, in the court’s opinion, the " 'parent has not manifested a significant parental interest in the child and is not prepared to assume the obligations of parenthood.’ ” (1980 Report of NY Law Rev Commn, Recommendation to Legislature Relating to the Rights of Fathers in the Adoption of Children Born Out of Wedlock, 1980 McKinney’s Session *405 Laws of NY, at 1672, 1673-1674.) Instead, the Legislature chose the current requirements, which the bill’s sponsor opined "follow the Supreme Court’s opinion which accords protection to fathers who 'participated in the rearing’ of the child, who * * * had 'manifested a significant paternal interest in the child,’ ” and that the bill would be a "reasonable, unambiguous and objective standard to guide agencies and courts.” (Sponsor’s Mem, 1980 NY Legis Ann, at 243.)
The desire to fashion reasonable, unambiguous and objective standards is surely understandable in these matters of high sensitivity. But given that unwed fathers who grasp the opportunity to shoulder the responsibilities of parenthood are entitled to as much protection of their rights in adoption proceedings as other parents, the "living together” requirement of Domestic Relations Law § 111 (1) (e) — which cuts off their interest by imposing as an absolute condition an obligation only tangentially related to the parental relationship— cannot stand.
Where the State interest is in determining the existence of a significant parental concern for a relationship with the child, the difficulty with the "living together” requirement stems from its focus on the relationship between father and mother, rather than father and child. When the child is surrendered for adoption by the mother at birth — as in the case of Baby Girl S. — under Domestic Relations Law § 111 (1) (e) the father can qualify for a veto right only if he has continuously lived with the mother for a full six months preceding the birth — in which case it seems unlikely that there would even be a conflict between father and mother on the question of adoption. Even if a father theoretically could qualify by living only with the child during a portion of the period prior to placement, by definition the statute in every instance requires some period of living with the mother, which does not establish parental responsibility toward the child.
The "living together” requirement can easily be used to block the father’s rights. But even more significantly, it permits adoption despite the father’s prompt objection even when he wishes to form or actually has attempted to form a relationship with the infant that would satisfy the State as substantial, continuous and meaningful by any other standard.
Nor does the "living together” requirement sufficiently fur *406 ther the State interest. The other two requirements of Domestic Relations Law § 111 (1) (e) — public acknowledgement of paternity within the six-month period preceding placement, and payment of pregnancy and birth expenses — already ensure that the father is both identifiable and, to some extent, ready to support the child financially. At any rate, the "living together” requirement adds nothing to either of those important considerations. Although the State plainly has a significant interest in fostering the well-being of the child by ensuring swift, permanent placement (see, Note, Lehr v Robertson: Putting the Genie Back in the Bottle: The Supreme Court Limits the Scope of the Putative Father’s Right to Notice, Hearing and Consent in the Adoption of his Illegitimate Child, 15 U Tol L Rev 1501, 1550-1553 [1984]), the State’s objective cannot be constitutionally accomplished at the sacrifice of the father’s protected interest by imposing a test so incidentally related to the father-child relationship as this one, directed as it is principally to the father-mother relationship.
Finally, the adoptive parents argue that the requirement promotes a strong State interest in assuring that the child has "stable” family relationships, presumably meaning a two-parent family. While the requirement might at first blush appear to promote that result between the biological parents, any connection between that objective and the means chosen to promote it disappears with the realization that the issue arises only when, over the father’s objection, the mother has surrendered the newborn infant and consented to adoption. Moreover, it is hardly obvious that the State has a sufficiently strong interest in ensuring that children are raised in a two-parent family to defeat the biological father’s right to a parental relationship. Indeed, since the State permits adoption by a single adult (Domestic Relations Law § 110), this argument also fails.
Accordingly, the "living together” requirement specified in Domestic Relations Law § 111 (1) (e) renders the statute unconstitutional as there is an insufficient fit with any valid State interest.
The remaining two statutory requirements are in a sense overlapping, since an acknowledged father under Family Court Act § 514 is already required to pay certain pregnancy and birth expenses. Although Domestic Relations Law § 111 (1) (e) is challenged only as to the "living together” requirement, we know with certainty from the format of the existing *407 statute as well as the contemporaneous expressions of intent that the Legislature would not have wished to have the unchallenged portions of the statute stand alone as the sole measure of an unwed father’s commitment to the child, entitling him to veto an adoption. Therefore, while mindful of the extraordinary significance of so doing, we have no recourse but to declare section 111 (1) (e) unconstitutional in its entirety.
We recognize from a mere statement of the problem, from the considerable commentary on the subject, and from the wide array of approaches taken by other States — which do not impose our "living together” requirement[3] — that it is no easy task to formulate unambiguous standards that both encapsulate the qualifying relationship and protect all of the important interests involved. Nonetheless, that effort is required.
Application of the Law to the Facts
Establishing a proper substitute is of course the prerogative of the Legislature, not the courts. Until there is new legisla *408 tion, however, it will be necessary for courts to resolve cases before them — including the two present appeals. In setting forth criteria that are to be considered by courts needing in this interim period to determine whether an unwed father has established the requisite interest for a right of consent, we underscore that we are not prescribing necessary or even appropriate elements for any new statute, or speculating as to its constitutionality.
While the Legislature might ultimately adopt different criteria, in this period courts will be guided by principles gleaned from the Supreme Court decisions, which define an unwed father’s right to a continued parental relationship by his manifestation of parental responsibility. In the case of newborn infants, we take this to mean that the qualifying interest of an unwed father requires a willingness himself to assume full custody of the child — not merely to block adoption by others. In this connection, any unfitness, or waiver or abandonment on the part of the father would be considered by the courts, as they would whenever custody is in issue (see, Matter of Bennett v Jeffreys, 40 NY2d 543).
An assertion of custody is not all that is required. The Supreme Court’s definition of an unwed father’s qualifying interest recognizes as well the importance to the child, the State and all concerned that, to be sufficient, the manifestation of parental responsibility must be prompt. In reaching this determination, courts should give due weight to the remaining portions of Domestic Relations Law § 111 (1) (e), which were directed to that same objective and are unchallenged in this litigation. Perhaps most significantly, they establish the period in which the father’s manifestation of responsibility for the child is to be assessed — the six continuing months immediately preceding the child’s placement for adoption. The interim judicial evaluation of the unwed father’s conduct in this key period may include such considerations as his public acknowledgement of paternity, payment of pregnancy and birth expenses, steps taken to establish legal responsibility for the child, and other factors evincing a commitment to the child.
Applying such considerations leads us to affirm the Appellate Division order in Baby Girl S., where there are extensive affirmed findings supported by the record to sustain the unanimous conclusion reached by the courts that Gustavo, *409 the biological father himself seeking full custodial responsibility virtually from the time he learned of Regina’s pregnancy, did everything possible to manifest and establish his parental responsibility. The Surrogate recited Gustavo’s persistent and uniformly rebuffed expressions of concern, offers of support and requests for custody, as well as his legal efforts to establish paternity and secure custody — within the six months preceding the infant’s placement — concluding from the evidence that he was "a concerned father” (141 Misc 2d, at 915), that he "obviously did all he could have done under the circumstances” (id., at 916), and that "Gustavo’s concern for his child is, at the very least, as substantial and significant as Mr. Caban’s concern for his children.” (Id., at 917.)
Though Miguel also wishes to assume custody, we cannot conclude in Raquel Marie that in the key six-month period he established his parental responsibility, and the matter must be remitted to the Appellate Division for further review of the facts. Having held that Miguel failed to satisfy the "living together” prong of section 111 (1) (e), the Appellate Division stated that it did not need to go any further in its factual review, observing only that "little evidence of compliance with [the remaining two statutory] requirements was adduced by the natural father in this case.” (Id., at 29.) Thus, while the trial court was satisfied that Miguel had manifested parental responsibility sufficient for a veto over the child’s adoption, the Appellate Division explicitly did not complete a review of the facts necessary to that determination.
Nor is the need for further review obviated by the fact of the marriage, as Miguel contends. Marriage obviously may be considered as one factor in determining whether the father has manifested the requisite parental responsibility, but the marriage must be timely in order to be considered substantial. It is surely not impermissible for the State, in order to protect children and prospective adoptive parents from heartbreak and uncertainty, to impose as a requirement for the automatic right of consent to adoption of a newborn infant that any marriage take place by the time the child is born (Domestic Relations Law § 24 [1]).
Accordingly, in Raquel Marie the Appellate Division order should be reversed, with costs, and the matter remitted to the Appellate Division for further proceedings in accordance with this opinion, and in Baby Girl S. the Appellate Division order should be affirmed, with costs.
*410 Chief Judge Wachtler and Judges Simons, Alexander, Titone, Hancock, Jr., and Bellacosa concur.
In Matter of Raquel Marie X.: Order reversed, etc.
In Matter of Baby Girl S.: Order affirmed, with costs.

. While the issue is not necessary to our disposition in this case, we cannot overlook the extensive affirmed findings of fraud on the court. Fraud on a court is intolerable in any proceeding; it is particularly so in adoption proceedings where misrepresentations may be calculated to circumvent statutory notice provisions and cut off constitutionally protected interests (see, e.g., Domestic Relations Law § 111 [3] [b]; Matter of Bennett v Jeffreys, 40 NY2d 543, 549).

. Before considering the constitutionality of the statute, we reject Miguel’s contention that his marriage to Louise on November 4,1988 — some five months after Raquel Marie’s birth and three months after her placement for adoption — alone requires his consent to the adoption, pursuant to Domestic Relations Law §24 (1), which legitimates a child born out of wedlock when the parents subsequently marry. In this respect we agree with the Appellate Division that the consent of the father is automatically required only for the adoption "of a child conceived or born in wedlock” (see, Domestic Relations Law § 24 [1]). Acceptance of Miguel’s argument would otherwise render that provision meaningless, and introduce a new uncertainty into every adoption; unwed parents could marry at any point before an adoption became final and thereby acquire an absolute veto (see, 150 AD2d, at 30). Miguel’s alternative contention that the marriage fortifies his constitutional argument is dealt with at page 409, infra.

. Illinois, for example requires that the father have lived with the child for at least half the length of its life prior to placement (with no reference to living with the mother) unless prevented from doing so (111 Stat Annot, ch 40, U 1510, §8 [a] [3]), and South Carolina has requirements similar to Domestic Relations Law § 111 (1) (e), but in the disjunctive (SC Code Annot § 20-7-1690 [A] [5]). In Maine, a putative father named in the birth record, or currently providing or attempting to provide support, or involved in or attempting to be involved in a family relationship with the child, upon notice must petition for custody of the child. If the court finds that paternity has been established, and that the father is willing and able to take custody, he has the right to consent to the adoption (Me Rev Stat Annot, tit 19, § 532-C). Other States require that the unwed father have established paternity prior to the adoption proceeding (see, e.g., Ark Code Annot § 9-9-206 [a] [2]; Burns Indiana Stat Annot § 31-3-1-6 [a] [2]), or even simply require consent of both biological parents (see, Ariz Rev Stat Annot § 8-106). A number of States have granted veto rights to unwed fathers on condition that they file a notice of paternity and intent to support the child within specified time limits — which may be as short as five days — provided they have not otherwise abandoned the child (see, e.g., Utah Code Annot § 78-30-4; Neb Rev Stat § 43-104.02).
Strict construction of the cited statutes has generally been upheld against constitutional challenge, although in several cases involving the affirmative thwarting of the father’s efforts to pursue his parental rights, they have been held unconstitutional as applied (see, In re Application of S.R.S. & M.B.S., 225 Neb 759, 408 NW2d 272 [1987]; Wells v Children’s Aid Socy., 681 P2d 199 [Utah 1984]; and Ellis v Social Servs. Dept. of Church of Jesus Christ of Latter-Day Saints, 615 P2d 1250 [Utah 1980]; see also, 1990 Utah Laws ch 245 [revised statute allows father to assert interest upon proof of impossibility of timely filing]).