■ In the Matter of Raquel Marie X. Mr. C. et al., Appellants; Mr. T. et al., Respondents.—Appeal in an adoption proceeding by the proposed adoptive parents from so much of an order of the Family Court, Westchester County (Barone, J.), entered May 10, 1989, as denied their petition for the adoption of the infant Raquel Marie. By order dated September 11, 1989, this court reversed the order insofar as appealed from, on the law, and remitted the matter to the Family Court, Westchester County, for further proceedings on the petition for adoption before a different Judge *(see, Matter of Raquel Marie X., 150 AD2d 23)*. On July 10, 1990, the Court of Appeals reversed the order of this court and remitted the matter to this court for further review of the facts in accordance with its opinion *(see, Matter of Raquel Marie X., 76 NY2d 387)*. That review has now been completed.

Ordered that the order is reversed insofar as appealed from, on the law and the facts, without costs or disbursements, and the matter is remitted to the Family Court, Westchester County, for further proceedings on the petition for adoption in accordance herewith, before a different Judge.

The facts underlying this court's prior decision and order in this matter are set forth in the text of that decision and order *(see, Matter of Raquel Marie X., 150 AD2d 23, supra)* and are augmented herein where necessary. Briefly, Raquel Marie X., the infant who is the subject of this adoption proceeding, is the biological child of the appellants Miguel T. and Louise T. In 1983 or 1984, Miguel and Louise first met while attending high school. On August 10, 1986, Louise gave birth to their first child, Lauren. The unmarried couple thereafter made sporadic attempts at living together, but their tumultuous relationship rendered their episodes of cohabitation short-lived, and they repeatedly returned to the residences of their respective parents. Raquel Marie was born on May 26, 1988. Her natural parents remained unmarried and were not cohabiting at the time of her birth. On July 22, 1988, Louise executed a consent to adoption and Raquel Marie was placed with the proposed adoptive parents, with whom she has resided ever since. On July 19, 1988, Miguel commenced a custody proceeding against Louise, and an order of filiation was entered upon his consent on August 19, 1988. Miguel and Louise eventually married on November 4, 1988, and Louise thereafter joined Miguel in opposing this proceeding by the

proposed adoptive parents to finalize the adoption of Raquel Marie.

The Family Court determined that Miguel had satisfied the requirements of Domestic Relations Law § 111 (1) (e) and that his consent to the proposed adoption was therefore necessary. Inasmuch as such consent had not been obtained, the Family Court denied the petition for adoption. This court reversed that determination after concluding that the cohabitation requirement of the statute had not been met. In reversing this court's order and declaring Domestic Relations Law § 111 (1) (e) unconstitutional, the Court of Appeals set forth the applicable criteria for determining whether an unwed father's consent to the adoption of a newborn child is necessary as follows:

"courts will be guided by principles gleaned from the Supreme Court decisions, which define an unwed father's right to a continued parental relationship by his manifestation of parental responsibility. In the case of newborn infants, we take this to mean that the qualifying interest of an unwed father requires a willingness himself to assume full custody of the child—not merely to block adoption by others. In this connection, any unfitness, or waiver or abandonment on the part of the father would be considered by the courts, as they would whenever custody is in issue *(see, Matter of Bennett v Jeffreys,* 40 NY2d 543).

"An assertion of custody is not all that is required. The Supreme Court's definition of an unwed father's qualifying interest recognizes as well the importance to the child, the State and all concerned that, to be sufficient, the manifestation of parental responsibility must be prompt. In reaching this determination, courts should give due weight to the remaining portions of Domestic Relations Law § 111 (1) (e), which were directed to that same objective and are unchallenged in this litigation. Perhaps most significantly, they establish the period in which the father's manifestation of responsibility for the child is to be assessed—the six continuing months immediately preceding the child's placement for adoption. The interim judicial evaluation of the unwed father's conduct in this key period may include such considerations as his public acknowledgement of paternity, payment of pregnancy and birth expenses, steps taken to establish legal responsibility for the child, and other factors evincing a commitment to the child" *(Matter of Raquel Marie X.,* 76 NY2d 387, 408, *supra).*

The application of the foregoing principles to the facts of the

instant case demonstrates that the parental interest asserted by Miguel is unworthy of legal protection, so as to render his consent to the adoption unnecessary.

The record fails to support a finding that Miguel took adequate and reasonably prompt steps to establish his legal responsibility for Raquel Marie. As the Court of Appeals has noted, "the biological father not only must assert his interest promptly (bearing in mind the child's need for early permanence and stability) but also must manifest his ability and willingness to assume custody of the child" *(Matter of Raquel Marie X., supra,* at 402). However, the hearing testimony of both Miguel and Louise demonstrates that Louise repeatedly expressed her intention to give the child up for adoption throughout her pregnancy. Significantly, while Miguel told her that he would never let her do so, he took no legal action during this period to establish his paternity, even though such proceedings may be maintained during the mother's pregnancy *(see,* Family Ct Act § 517; *Matter of John E. v Doe,* 164 AD2d 375 [plurality slip opn by Brown, J.]). Miguel's attempt to explain his inaction was extremely vague and wholly unsubstantiated, inasmuch as he claimed that he was advised by unidentified representatives of the Family Court and of an unspecified agency for women, as well as by his attorney, that no proceeding could be commenced until after the birth of the child. Additionally, Miguel's professed desire to establish his legal responsibility for Raquel Marie is further belied by his actions subsequent to her birth. Indeed, while he testified that he repeatedly visited Louise and the child at the hospital during hours reserved for fathers, he was not listed in Raquel Marie's birth certificate as the father and his alleged visits were not reflected in the visiting records kept by the hospital. Similarly, Miguel was content to leave Raquel Marie's care to Louise, despite the fact that Louise often complained of her inability to attend to the needs of two children. He took no steps to establish his paternity or to obtain custody at this time, and when informed by Louise that she would temporarily place Raquel Marie in foster care, he replied that such placement would be "fine". Likewise, during the 20-day period that Raquel Marie was in foster care, Miguel did not assert any parental rights with respect to her. Rather, Miguel only filed a custody petition after what he perceived to be delay and reluctance on the part of the foster care agency in returning Raquel Marie to Louise. Hence, the foregoing evidence leads us to conclude that this petition, while filed some three days prior to Raquel Marie's actual placement for

adoption, merely evinced an intention on Miguel's part to block the anticipated adoption and did not constitute an expression of genuine desire to assume full custody *(see, Matter of Raquel Marie X., 76 NY2d 387, 408, supra; see also, Matter of John E. v Doe, supra)*. Under these circumstances, it cannot be said that Miguel "promptly avail[ed] himself of all the possible mechanisms for forming a legal and emotional bond with his child" *(Matter of Raquel Marie X., supra,* at 402).

The record likewise fails to establish that Miguel's public acknowledgement of paternity and payment of pregnancy and birth expenses were sufficient. As previously noted, Miguel was not listed as the father on Raquel Marie's birth certificate. Furthermore, his hearing testimony regarding his acknowledgement of paternity was equivocal at best. Thus, he testified that his own parents "found out" that Louise was pregnant with his child, that his friends and family "knew" of the pregnancy, that everyone at a Thanksgiving dinner which he attended was aware of the pregnancy because a friend of Louise told them, and that the people at a Christmas gathering at which he appeared had learned of the pregnancy from someone named "Tommy". Moreover, the pregnancy was not disclosed to Louise's family, and her father did not learn of Raquel Marie's existence until after the child had been placed for adoption. Other than the custody petition which was filed in an attempt to block the adoption, the remaining evidence regarding acknowledgement of paternity consisted of Miguel's testimony that Louise would bring the two children to softball games in which he played.

The evidence of Miguel's financial contributions also fails to support his claim of parental interest. The record reveals that in early 1988, Miguel took Louise to a gynecologist and paid the $60 fee. Moreover, in March 1988, Miguel purchased a chair for Louise for $310 to ease her discomfort during the pregnancy. However, despite the fact that Miguel maintained employment at this time and resided with his family, these two expenditures appear to constitute his entire personal financial contribution to the expenses occasioned by the pregnancy. Although he did have Louise undergo a sonogram in February 1988, the $165 fee was paid for with a check supplied by Miguel's father. Furthermore, on cross-examination Miguel admitted that the purpose of the sonogram was to provide him with evidence of the pregnancy which he could use in defending himself against certain criminal charges filed by Louise. Similarly, while it appears that Miguel reimbursed

Louise for the $850 cost of the pregnancy clinic which she attended, he did so with a money order which was given to him by his father. Inasmuch as Miguel never established that he was without funds to pay for the sonogram and clinic himself, we do not attribute his father's payment of these expenses to any recognition or exercise of parental responsibility on the part of Miguel.

In our view, the evidence of legal responsibility, public acknowledgement of paternity, and contribution to pregnancy and birth expenses fails to demonstrate that Miguel is "a father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child" *(Matter of Raquel Marie X., 76 NY2d 387, 403, supra).* Indeed, his manifestation of parental responsibility in this case "was neither sufficiently prompt nor sufficiently substantial to require constitutional protection" *(Matter of John E. v Doe, supra,* at 382 [plurality slip opn by Brown, J.]).

Finally, we note that the question of Miguel's fitness was not expressly placed in issue at the hearing before the Family Court. Nevertheless, we cannot ignore the fact that the hearing record is replete with proof of numerous instances of violent and abusive conduct on his part which raise grave doubts as to his fitness to assume complete custody. Although Miguel and Louise attempted to minimize the serious nature of these episodes in their hearing testimony, they failed to persuasively controvert the overwhelming evidence of Miguel's improper and dangerous behavior. For example, according to previous allegations made by Louise, Raquel Marie is the product of a forcible rape which occurred in September 1987. Miguel conceded that this incident was in violation of an existing court order of protection, apparently issued in connection with a July 1987 episode in which Louise sustained a gash over her eyelid after he punched her in the eye. Such instances continued unabated during Louise's pregnancy and after she gave birth to Raquel Marie, and included episodes in which Miguel slapped Louise, verbally abused her, choked her, and kicked in the door of her parents' home. These instances resulted in Louise filing numerous criminal complaints against Miguel and in the issuance of several orders of protection. Additionally, in March 1988, Miguel entered a plea of guilty to assault in the third degree and criminal mischief in the fourth degree in connection with his repeated misconduct toward Louise. Similarly, shortly after Raquel Marie's birth, Miguel allegedly pulled Louise's clothes off and choked her in

front of their daughter Lauren after complaining that she was dressed like a "slut" and a "whore".

Moreover, Miguel's financial support of Lauren, an issue relevant to his ability and willingness to support Raquel Marie, left much to be desired. Indeed, despite the fact that Miguel was earning in excess of $400 per week in October 1986 and was living with his father at this time, his failure to provide adequate support for his child prompted Louise to obtain a Family Court order in November 1986 directing him to pay $100 per week for Lauren's support. While Miguel conceded that he did not always comply with this order, he testified that he did give money to Louise at times. Despite these alleged payments, Louise applied for public assistance, claiming that she was not receiving child support. Moreover, in a January 1988 letter sent to the Family Court, Louise averred that despite the order of support, "I have not received any form of child support [and] I alone am supporting my daughter Lauren, and have no other form of payment coming to me". Inasmuch as the foregoing evidence is certainly indicative of a lack of fitness and an unwillingness to accept parental responsibility on the part of Miguel, it serves to reinforce our conclusions that his interest in Raquel Marie is not entitled to constitutional protection and that his consent to the adoption is not needed. Accordingly, we reverse and remit the matter to the Family Court for a prompt hearing and resolution of the remaining issues in this case. Bracken, J. P., Kunzeman, Sullivan and Balletta, JJ., concur.