OPINION OF THE COURT
Henry J. Scudder, S.
This matter comes before the court to determine whether or not Mr. W. has the right to veto the adoption of his child. The *261 child Kyle was born on January 15, 1992. Mr. W. and Ms. S. resided together from September 1990 until August 1991. In May of 1991 Ms. S. discovered that she was pregnant. The testimony of Ms. S. and Mr. W. revealed that the pregnancy was planned and that it was a happy event. Mr. W. consistently acknowledged the paternity of the child. He provided financial support for Ms. S. and purchased a cradle for the baby. Further, Mr. W.’s family gave a baby shower for Ms. S. The record was replete with evidence that Mr. W. was a proud expectant father.
On the 6th day of August 1991, Mr. W., along with others, committed a violent felony which for him was his second felony offense. Mr. W. participated in the robbery of an 83-year-old woman who was tied, threatened that she would he raped and that her throat would be slit.
Due to the commission of a violent felony Mr. W. was committed to the Steuben County Jail on August 7, 1991. Ms. S. was also incarcerated due to her alleged involvement in the robbery, but was released. The testimony reflected that Mr. W. requested that his defense attorney obtain a court order so that he could be present when the baby was born. The record showed that Mr. W. continually talked about the birth of his child and after the child was born requested that his defense attorney file a paternity petition and/or a petition for visitation. Mr. W. was not successful in obtaining an order to be present when the child was born, but he did talk with both his mother and Ms. S. on the day of the child’s birth. In fact he passed out cigars at the Steuben County Jail proclaiming the birth of his son. After the child’s birth, Mr. W.’s mother along with others brought the child to Steuben County Jail at intervals of approximately twice a week where he visited with the child. Visitation was approximately one hour in length each time.
It appears that after the baby was born, Ms. S. commenced a relationship with another man and broke off the relationship with Mr. W. in February 1992. On May 15, 1992 she executed a judicial surrender of the child in Steuben County Surrogate’s Court. Mr. W. was then noticed as to the adoption and his consent to the adoption was requested at an appearance that he made before this court. Previous to this appearance, Mr. W. was unaware that Ms. S. had surrendered the child, and he vehemently contested the adoption. In fact he stated that he wanted his son, and that he would take measures to provide for him. After that appearance, he filed a *262 paternity petition in the Family Court. An order of filiation was granted.
Mr. W. pleaded guilty to several crimes including robbery in the first degree on July 7, 1992 in the Steuben County Court. Sentencing was set for August 10, 1992 and a sentence promise had been given of no more than 4Vi years minimum to 9 years maximum. At the sentencing on August 10, 1992 Mr. W. was sentenced to 4 Vi years to 9 years in a New York State correctional facility. Mr. W. will receive credit for the time that he has spent in the Steuben County Jail from August 7, 1991. At the hearing on August 5, 1992 Mr. W. set forth a plan wherein the child, Kyle, would live with Mr. W.’s aunt, until his release from the correctional facility. Ms. S. testified that the child could reside with her if she were to have custody until Mr. W. was able to assume custody, and further testified that the child could be placed on her husband’s health insurance policy. Ms. S. is employed at a local hospital which provides day care. Mr. W. included in the plan for the care of his child that his mother, Mrs. W., would transport the child to the correctional facility in order that he may visit with the child. Mrs. W. testified that she would take the child anywhere in the State at least once a month. She further testified that if her son was placed at either Southport or Elmira Correctional Facilities she would transport the child to see his father twice a week. Also, there was testimony that Mr. W.’s daughter, Nicole, born on July 21, 1978 has had an acceptable relationship with her father in that he has exercised his right to visitation pursuant to a Family Court order and also has visitation with Nicole two to three weeks in the summer. Nicole has been visiting with her father at the Steuben County Jail and has had an ongoing relationship with him.
There can be no question that Mr. W. wants this child and that the child’s birth was planned. He has done everything humanly possible to maintain and sustain a relationship with the child and at all times has held himself out to be the father of the child. He truly wants to be the child’s father. This is not a case as in Matter of Steven C. (170 AD2d 1035 [4th Dept 1991]) where an unwed father who was in jail wanted to veto the adoption of his child but did not want to take custody of the child himself. The father in Steven C. wanted his family to raise his child on a permanent basis. Clearly, Mr. W. intends to raise the child once he is no longer incarcerated. There is no merit to the argument of the prospective adoptive parents *263 that Mr. W.’s claim to love his child is only for the purpose of shortening his prison sentence.
However, Mr. W.’s desire to raise his child has been derailed by his committing the crime of robbery in the first degree, a violent felony, which has caused him to be incarcerated since August 7, 1991 and has resulted in a sentence of 4 Vi years to 9 years in a New York State prison.
Given the foregoing, it must be determined whether or not Mr. W. may veto the adoption of Kyle and execute the plan which he has made for Kyle’s care.
Although not discussed by either party, it is critical to review the United States Supreme Court cases which are the basis of any unwed father’s claim that he has the right to veto the adoption of his child. An unwed father may have a constitutionally protected right to a parent-child relationship. Four United States Supreme Court cases explore the various situations in which that right does and does not attach. (Stanley v Illinois, 405 US 645 [1972]; Quilloin v Walcott, 434 US 246 [1978]; Caban v Mohammed, 441 US 380 [1979]; Lehr v Robertson, 463 US 248 [1983].) The fathers in Stanley and Caban were unwed fathers that had a custodial relationship with the child prior to the adoption petition. That is they did at some time live with the children and actively participated in the children’s lives. Those relationships were found to be constitutionally protected. Quilloin and Lehr both involved children who were to be adopted by stepfathers. The Supreme Court found that in both of those cases there was not a protected relationship between the unwed father and his child.
The Court in Lehr v Robertson (supra) distinguishes between the developed parent-child relationship as in Stanley (supra) and Caban (supra), and the potential relationship involved in Quilloin (supra) and Lehr. Clearly, the situation between Kyle and Mr. W. is that of a potential relationship, as it is with all infant adoptions. This situation is further complicated by Mr. W.’s inability, due to his incarceration, to foster a familial relationship as the Supreme Court refers to in Lehr. Quoting Smith v Organization of Foster Families (431 US 816 [1977]), the Court notes: " '[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from intimacy of daily association, and from the role it plays in "promoting] a way of life” through the instruction of children * * * as well as *264 from the fact of blood relationship.’ ” (Lehr v Robertson, at 261.)
Justice Stevens in discussion of the father’s due process rights talks in terms of the "opportunity” that the natural father has to develop a relationship with his child. He relies on comments made by Justice Stewart in his dissenting opinion in Caban (supra) that "parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring.” (Lehr v Robertson, supra, at 260.)
The Court in Lehr (supra) then addressed the argument that the unwed father has an equal protection right on par with the mother’s, to veto an adoption. Again the Court relies upon the relationship between the father and the child, quoting from Caban (supra): "If the father had not 'come forward to participate in the rearing of his child, nothing in the Equal Protection Clause [would] preclud[e] the State from withholding from him the privilege of vetoing the adoption of the child.’ ” (Lehr v Robertson, at 267.)
It is well established in the record that Mr. W. would come forward and raise his child if he were not incarcerated.
The Court of Appeals in Matter of Raquel Marie X. (76 NY2d 387 [1990]) declared Domestic Relations Law § 111 (1) (e) unconstitutional and set interim standards to guide the courts in determining when an unwed father has the right to consent to or veto an adoption. The Court recognizes that an unwed father is entitled to the full custodial relationship with his newborn child so long as "he promptly avails himself of all of the possible mechanisms for forming a legal and emotional bond with his child.” (Matter of Raquel Marie X, at 402.) The Court interprets the Lehr decision (supra) to mean that "in order to have the benefit of the maximum protection of the relationship — the right to consent to or veto an adoption — the biological father not only must assert his interest promptly (bearing in mind the child’s need for early permanence and stability) but also must manifest his ability and willingness to assume custody of the child.” (Matter of Raquel Marie X., at 402 [emphasis supplied].)
There is no question that Mr. W. promptly asserted his interest in the child within the six-month time frame discussed in Raquel Marie X. (supra). It is obvious that Mr. W. is willing to assume custody. The question then becomes, what does his ability to assume custody entail? He clearly has made *265 a viable plan for the child’s care during the term of his incarceration. The question to be answered is whether that plan satisfies the requirements of Raquel Marie X. and the preceding Supreme Court cases. For guidance the Court of Appeals refers to Buchanan, The Parent-Child Relationship and the Current Cycle of Family Law Reform: The Constitutional Rights of Unwed Fathers Before and After Lehr v Robertson (45 Ohio St LJ 313).
Professor Buchanan discusses the nature of custody to be the intertwining of rights and responsibilities, not a type of parental possessory right. (Buchanan, op. cit., at 319.) She summarizes that the constitutional protection for the relationship between the unwed father and the child is "inextricably linked to parental performance of the duties included in the term 'custody’: provision for the physical and emotional needs of children, provision of guidance and direction to children, and living with children on a day-to-day basis.” (Buchanan, op. cit., at 350.)
It appears then that the constitutional right attaches only when the father fully exercises his opportunity to establish a protected custodial relationship. That is, that he promptly asserts his biological link with the child and commits to and exercises custodial responsibility himself. This situation is unlike the requirement in Social Services Law § 384-b, that in order to avoid the termination of parental rights by reason of permanent neglect, the parents shall make a plan for the child. Here, the unwed father who claims a right to veto the adoption must be willing and able to assume custodial responsibility for the child, not simply make a plan to avoid a situation where the child is in foster care for an indefinite time. (See, Matter of Gregory B., 74 NY2d 77 [1989].) To allow a father to simply provide for the care of his child by means of delegating his custodial responsibility to another, is, in effect acting only to block the adoption. Granted, this is not a situation where the father in not interested and willing to assume full responsibility for his child, but for the term of his incarceration, 4Vi to 9 years, he is unable to.
The ability to assume parental responsibility becomes, it seems, a matter of degree. This situation would be entirely different if, for example, the father was to be released from jail in 40 days, rather than 4 years. In that instance, the temporary care of the child by a relative would likely be entirely appropriate. The State’s interest involved in adoption laws and permanency for the child would certainly not out *266 weigh the father’s right to establish a relationship with his child if he would be able to assume custody in a prompt fashion. What a "prompt fashion” is would necessarily be determined on a case-by-case basis. The Court in Raquel Marie X. (supra, at 408) requires that the father’s manifestation of his intent to assume parental responsibility occur in the six months prior to the adoption placement. To allow a slight delay in actually assuming custody would not violate that requirement. It is only the extent of time involved that prohibits Mr. W. from being cloaked with constitutional protection.
The Court of Appeals is clear that the manifestation of parental responsibility must be prompt, considering not only the substantial State interest in adoption laws, but also the child’s need for permanence and stability. (See, Matter of Raquel Marie X., supra, at 402, 404.)
There is no question that Mr. W. has done all that he possibly could do to establish himself as a proud father, and a father that truly loves his son. However, his relationship with the child does not rise to the level where it is constitutionally protected, thereby enabling him to veto this adoption. He is unable to accept the custodial responsibility necessary for that constitutional protection to attach.
There is no doubt that if Mr. W. were in a position to assume the custody of his son, that the adoptive parents would undergo the excruciating heartache of relinquishing this child that they have loved and nurtured. This is a situation that will arise more and more frequently in the context of privately arranged adoptions. It is the duty of attorneys hired to facilitate these adoptions to ensure that the prospective adoptive parents are fully aware of the legal risk involved in accepting placement of a child before the legal rights of the father are fully determined. In this matter the adoption petition claimed that the father was "unknown-may be in jail”. Obviously, if the information regarding his whereabouts was available, then the identity and position of the father concerning the adoption is at least obtainable. Attorneys must be scrupulous in their efforts to facilitate a private adoption by investigating fully the legal risk at which the child is being placed and fully informing the prospective adoptive parents of those risks. The emotional circumstances of attempting to adopt a child make the prospect of having to take a child away from prospective adoptive parents all the more tragic. This court finds it extremely difficult to deny Mr. *267 W.’s application to veto the adoption and again states that it is only due to Mr. W.’s 4Vz- to 9-year sentence that the adoptive parents are able to prevail.
It is the decision of this court that Mr. W. does not have the right to veto the adoption of Kyle.