■ In the Matter of SEASIA D. MR. ANONYMOUS et al., Appellants; KAREEM W., Respondent. TENISHA D., Nonparty Appellant. [848 NYS2d 361]—

In an adoption proceeding pursuant to Domestic Relations Law article 7, the prospective adoptive parents, the petitioners Mr. Anonymous and Mrs. Anonymous, the petitioner Family Focus Adoption Services, and the nonparty birth mother Tenisha D., separately appeal from an order of the Family Court, Queens County (DePhillips, J.), dated June 30, 2006, which, after a hearing, in effect, denied the petition and dismissed the proceeding.

Ordered that the order is affirmed, without costs or disbursements, and the matter is remitted to the Family Court, Queens County, to set a date for the production of the child by the prospective adoptive parents, for a determination of where the subject child shall reside pending resolution of the biological father's custody proceeding, and for a determination of the biological father's custody proceeding.

In the instant case, the Family Court denied the adoption petition on the grounds that the biological father was a "consent father," that is, one whose consent to the adoption is mandated by statutory and due process requirements, who did not consent to the adoption, and that the extrajudicial consent of the birth mother was invalid. The prospective adoptive parents and their private adoption agency argue on appeal that the biological father, by his conduct, failed to qualify as a "consent father," and that the adoption petition thus should have been granted without the necessity of obtaining his consent. They further argue that, to the extent that the birth mother's extrajudicial consent to the adoption was invalid, any irregularity could and would be easily rectified by her execution of a new, valid consent. The Law Guardian for the birth mother, who was 14 years old when the subject child was born, similarly contends that although her extrajudicial consent to the adoption was in fact invalid, the biological father's consent was not required and that she is prepared to execute a new consent providing for an open adoption. The Law Guardian for the child argues that the Family Court properly determined that the biological father is a "consent father." We note that the birth mother was a foster

child who was herself adopted shortly before she and the biological father learned that she was pregnant.

On the question of whether the biological father's consent was required as a condition to the adoption, Domestic Relations Law § 111 (1) (e) states that if the child is under six months old at the time of placement, a nonmarital father has a right to consent if he lived with the mother for six months immediately preceding the placement of the child for adoption, held himself out as the father during that period, and paid a reasonable sum in accordance with his means for the expenses of the birth. In *Matter of Raquel Marie X.* (76 NY2d 387 [1990], *cert denied sub nom. Robert C. v Miguel T.,* 498 US 984 [1990]), the Court of Appeals held that the "living together" requirement was unconstitutional, declaring the provisions nonseverable and therefore unconstitutional in their entirety. Pending the Legislature's formulation of a new standard (which the Legislature has yet to accomplish) the Court of Appeals set forth judicially-created interim criteria, to wit, a willingness to assume full custody in the six months prior to the placement of the child for adoption, evidenced by payment of pregnancy and birth expenses, and a public acknowledgment of paternity within the six months immediately preceding the child's placement for adoption (*see Matter of Robert O. v Russell K.,* 80 NY2d 254 [1992]).

In the instant case, the evidence at the hearing established that, during the relevant six-month period, the biological father publicly acknowledged paternity and exhibited a willingness to assume full parental responsibilities. However, those efforts were rebuffed by the birth mother's family. We note that certain hearsay evidence with respect to this issue was admitted by the Family Court not for the truth of the statements, but to "know the circumstances" to which the biological father was responding. Contrary to the appellants' contentions, this evidence was admissible for that purpose and to show state of mind (*see Matter of Marino S.,* 100 NY2d 361, 372 [2003], *cert denied sub nom. Marino S. v Angel Guardian Children & Family Servs.,* 540 US 1059 [2003]; *Matter of Doreen J. v Thomas John F.,* 101 AD2d 862 [1984]).

The biological father first learned of the birth mother's pregnancy in November 2003, when she was already five months pregnant, and he immediately believed that the child was his. The following Sunday, the birth mother's family and the biological father's family met at the home of the biological father's aunt. According to the biological father, the purpose of the meeting was to "clarify that I did not rape" the birth mother and because "I wanted to see her; she was pregnant."

The birth mother's adoptive mother (hereinafter the maternal grandmother) was deceased at the time of the hearing. However, at the hearing, the biological father's aunt testified that the maternal grandmother said she did not believe that the biological father forcibly raped the birth mother. The birth mother's adult adoptive sister (hereinafter the aunt) confirmed that, at the meeting, the maternal grandmother did not believe the allegations of forcible rape. Since the biological father was a minor at the time he had sexual relations with the birth mother, his conduct could be classified as sexual misconduct on the ground that the birth mother was under 17 years old (*see* Penal Law § 130.20), but it could not be classified as statutory rape (*see* Penal Law §§ 130.25, 130.30). Accordingly, contrary to the contention of our dissenting colleague, there is no basis to conclude that the biological father's concerns were more penal than paternal.

At that meeting, the paternal grandmother, speaking on behalf of the biological father's family, asked if anything could be done for the child. The maternal grandmother's response was that something could be done if the biological father or the paternal grandmother "could find her."

Two days later, the paternal grandmother called the aunt and offered to go shopping and buy maternity clothes. The aunt replied that "Mom [referring to the maternal grandmother] does not want anything from you." Thereafter, the paternal grandmother called the aunt every two or three days at the biological father's request, and asked to speak to the birth mother.

The fact that the biological father involved his own mother in the process militates in his favor since it demonstrated a public acknowledgment of paternity and an intent to secure custody with her help (*cf. Matter of Michael*, 272 AD2d 618 [2000]). The evidence in the record establishes that the paternal grandmother acted at her son's repeated requests. The biological father asked the paternal grandmother to call the aunt because the two women had a relationship with each other which was "really close." He expected that if his mother called, she would be permitted to speak to the birth mother, a situation which would then allow him to "take the phone" and speak to the birth mother immediately thereafter. However, the birth mother's family stopped taking telephone calls. The paternal grandmother tried calling from a third party's telephone, but once the aunt realized who was calling, she claimed she "couldn't talk," promised to call back, but never did. The birth mother confirmed that the maternal grandmother prohibited her from contacting the biological father.

The aunt testified that during the period when the aunt was still conversing with the paternal grandmother, the birth mother apparently had not decided what to do with respect to the pregnancy. The aunt claimed that she had taken the birth mother to an abortion clinic and learned that a late abortion would require a two-day procedure which was too difficult for a girl as young as the birth mother to bear. The aunt testified that no decision could be made as to the pregnancy because it was "up to" the maternal grandmother.

The aunt's testimony was corroborated by the birth mother's testimony that the maternal grandmother threatened to "put me out [of] the house 'cause she don't want no teenager girl pregnant in her house." The birth mother gave this threat credence, since she was a foster child recently adopted by the maternal grandmother and her biological sister had been returned to foster care by the maternal grandmother. The birth mother confirmed that she went to an abortion clinic. Thereafter, she went to an adoption agency. It is not disputed that the adoption agency was not contacted until January 2004, and the birth mother's first appointment with the adoption agency was in the third week of January 2004.

During this period, the biological father was unable to ascertain where the birth mother lived. He went to the birth mother's church in hopes of seeing her there, but her family was keeping her home. The paternal grandmother called a list of child welfare agencies in an attempt to determine where the birth mother lived and, in fact, reached a caseworker from Seamen's Society for Children and Families, which had handled the adoption of the birth mother. The caseworker provided no information. The biological father asked the birth mother's family if he could be present at the birth of the child, but was told that he would be arrested for statutory rape if he attempted to do so.

The biological father testified that he attempted to commence a paternity proceeding in the Family Court, Richmond County, but was told to wait until he knew that the child was born. This was incorrect, since Family Court Act § 517 authorizes the commencement of a paternity proceeding during the mother's pregnancy. Moreover, the biological father was unaware of the Putative Father Registry maintained by the New York State Department of Social Services.

The biological father testified that if he knew where the birth mother was giving birth, he would have gone, despite the threat that he would be arrested. However, he was not notified of the adoption until nine days after the child's birth, when the aunt

called the paternal grandmother and told her that she could "stop harassing" the birth mother's family because the baby had been born, and "we gave it away." At that juncture, the paternal grandmother went through old church papers and found an envelope with an unfamiliar address on it which she suspected might be the birth mother's address. The biological father, the paternal grandmother, and a cousin went to that address and confirmed that it was the birth mother's address, when they saw the maternal grandmother's car in front of the house. The biological father promptly commenced a paternity proceeding and a custody proceeding less than one month after the child's birth.

Although the paternity proceeding and the custody proceeding were commenced after the child was placed for adoption, the biological father's conduct prior to the child's placement for adoption, which included a public acknowledgment of paternity, efforts to provide support which were rebuffed, and efforts to witness the birth which were rebuffed, were sufficient to establish that his consent is required for the placement of the child for adoption (see Matter of Kiran Chandini S., 166 AD2d 599 [1990]; see also Matter of Matthew D., 31 AD3d 1103 [2006]). The father's efforts were not so much rebuffed by threats—since it became apparent that threats would not work—but by the efforts of the birth mother's family to keep her plans a secret and to insure that the biological father played no parental role whatsoever. Since he was not informed of the birth mother's plans or the child's birth until after the child was surrendered for adoption, his failure to immediately assume custody cannot be considered a waiver (see Matter of Kiran Chandini S., 166 AD2d 599 [1990]).

Since the birth mother's medical expenses were paid by Medicaid, the biological father's failure to contribute to those expenses is thus not determinative (see Matter of Kiran Chandini S., 166 AD2d 599 [1990]).

In addition, the relocation of the biological father's family to Maryland on January 30, 2004, during the birth mother's pregnancy, cannot be deemed to constitute a waiver. The birth mother's family knew about the planned move before they knew about the birth mother's pregnancy. The biological father and the paternal grandmother discussed the move with the birth mother's family and left their forwarding address, the addresses and telephone numbers of other close relations in both Maryland and New York, and the paternal grandmother's mobile telephone number. The aunt acknowledged that she had the paternal grandmother's mobile telephone number. A mutual

friend from the biological parents' church also delivered this information to the birth mother, and told her "Don't forget us." The birth mother confirmed that she received this information. The friend was rebuked by the maternal grandmother for providing that information to a minor without parental permission. The attempts to reach the birth mother's family by telephone continued after the move to Maryland, to no avail.

This case is thus diametrically different from *Matter of Baby Boy C.* (13 AD3d 619, 620 [2004]), cited by our dissenting colleague, where a biological father "abandoned" the mother by moving to North Carolina during the birth mother's pregnancy without informing her of his whereabouts.

Our dissenting colleague, while acknowledging that the biological father's exercise of supervised visitation after he was adjudicated the legal father in October 2004 is not relevant to our determination of whether he is a "consent father," nevertheless cites testimony by the prospective adoptive father that the supervised visits by the biological father were "at best, unreliable and sporadic . . . indicating a lack of any serious interest in forming a full father-child relationship." The record with respect to supervised visits is at best incomplete, since there has been no hearing with respect to the best interest of the child. However, it is clear that—although the visits are professionally supervised —one of the prospective adoptive parents insisted on being present and would not permit the father to take the child to a more appropriate setting, such as a nearby park. Further, during the periods in which the biological father was in New York for the hearing, the prospective adoptive parents canceled consecutive scheduled visits. Therefore, the biological father's numerical record of attendance at scheduled visits is not a basis to conclude that he lacks any serious interest in forming a parent-child relationship with the child.

Thus, we reject the appellants' contention that the biological father, by his conduct, forfeited his status as a "consent father."

Further, we agree with the Family Court that the extrajudicial surrender by the birth mother, who was 14 years old at the time, was invalid since she was acting under the duress imposed upon her by the maternal grandmother, who threatened to return her to foster care if she did not execute the surrender. Moreover, she did not have independent counsel, and her wishes for an open adoption were not explicitly provided for (*see* Social Services Law § 384 [5]; *Matter of Baby Boy L.*, 144 AD2d 674 [1988], *cert denied sub nom. Laurence v Anonymous,* 493 US 918 [1989]; *Matter of Male L.,* 125 Misc 2d 420 [1984]).

Further, we note that the Legislature's failure to amend Domestic Relations Law § 111 (1) (e), which was declared unconstitutional 17 years ago (*see Matter of Raquel Marie X.*, 76 NY2d 387 [1990]), in order to provide statutory criteria in the place of what was supposed to be an interim judicial standard, renders the determination of difficult cases such as this even more difficult. We urge the Legislature to act without further delay.

Thus, we remit the matter to the Family Court, Queens County, for further proceedings consistent herewith, including a determination with respect to the biological father's custody petition. We note that the birth mother has, to date, not petitioned for custody of or visitation with the child. Crane, J.P., Goldstein and Carni, JJ., concur.

Dillon, J. (dissenting and voting to reverse the order appealed from, on the law, on the facts, and in the exercise of discretion, and to remit the matter to the Family Court, Queens County, for the execution by the birth mother of a new extrajudicial consent to the adoption of the subject child, the filing of an amended petition within 90 days, and a determination on the amended petition thereafter, with the following memorandum): While I concur with the majority that the extrajudicial consent executed by the birth mother was invalid, I respectfully dissent from that portion of the decision which concludes that the biological father's consent to the adoption was required.

Domestic Relations Law § 111 (1) (e) is the consent statute that is relevant here, because the child was under six months of age at the time she was placed for adoption. In 1990, the New York Court of Appeals, in *Matter of Raquel Marie X.* (76 NY2d 387 [1990]) struck down as unconstitutional the portion of Domestic Relations Law § 111 (1) (e) that required cohabitation of the birth parents, and called upon the Legislature to enact a replacement statute. The New York Legislature has yet to amend Domestic Relations Law § 111 to correct its constitutional infirmities. Thus, in determining whether or not an unwed father has the right to consent to the proposed adoption of his less-than-six-month-old child, courts must follow the interim judicial criteria set forth by the Court of Appeals in *Matter of Raquel Marie X.* (76 NY2d 387 [1990]). I do not agree with the majority that the biological father in this case has satisfied the required judicial criteria.

The Court of Appeals, in *Matter of Raquel Marie X.*, conducted a thorough analysis of the evolution of United States Supreme Court case law and New York statutory provisions to explain that "[u]ntil the 1970's, unwed fathers had no legally recognized interest" in the father-child relationship (*id.* at 397), but that

since the 1970's, "the interest of unwed fathers in a relationship with their children has gained significant recognition in the law" (*id.* at 401).

The interests of unwed fathers cannot be taken lightly in this or any action. The protected interest of an unwed father, however, is by no means absolute and "is not established simply by biology" (*id.*). As declared by the Court of Appeals, "[t]he unwed father's protected interest requires both a biological connection and full parental responsibility; he must both be a father and behave like one" (*id.* [citation omitted]). Thus, in a proposed adoption by strangers, an unwed father's interest in the father-child relationship is protected "so long as he promptly avails himself of all the possible mechanisms for forming a legal and emotional bond with his child" (*id.* at 402 [citations omitted]). According to the Court of Appeals, in order for an unwed birth father: "to have the benefit of the maximum protection of the relationship—the right to consent to or veto an adoption—[he] not only must assert his interest promptly (bearing in mind the child's need for early permanence and stability) but also must manifest his ability and willingness to assume custody of the child" (*id.* at 402).

In evaluating a father's ability and willingness to assume custody, courts examine whether the father (1) publicly acknowledged paternity, (2) paid for medical and related pregnancy and birth expenses, (3) took steps to establish legal responsibility for the child, and (4) took any other steps to demonstrate his commitment to the child (*see Matter of Robert O. v Russell K.,* 80 NY2d 254, 262 [1992]; *Matter of Raquel Marie X.,* 76 NY2d at 405-406, 408; *Matter of Baby Boy C.,* 13 AD3d 619, 620 [2004]). A birth father can lose his interest in the father-child relationship if he fails to "grasp such opportunities for a significant relationship" (*Matter of Raquel Marie X.,* 76 NY2d at 402).

In enunciating the standard to be applied pending legislative action, the Court of Appeals declared, in pertinent part, that: "[i]n the case of newborn infants . . . the qualifying interest of an unwed father requires a willingness himself to assume full custody of the child—not merely to block adoption by others . . . An assertion of custody is not all that is required" (*id.* at 408).

The Court of Appeals determined that "the manifestation of parental responsibility must be prompt" (*id.*). Moreover, upon giving due consideration to the remaining portions of Domestic Relations Law § 111 (1) (e) that were unchallenged in *Matter of Raquel Marie X.,* the Court of Appeals reiterated that the "peri-

od in which the father's manifestation of responsibility for the child is to be assessed [is] the six continuing months immediately preceding the child's placement for adoption" (*id.*; *see also Matter of Baby Boy C.,* 13 AD3d at 620).

Here, the record reveals that when the subject child was born, the biological father and birth mother were 17 and 14 years old, respectively. The biological father learned of the birth mother's pregnancy in November 2003. The child was born on April 1, 2004. The birth mother executed a non-judicial surrender of the child on April 3, 2004. Accordingly, the relevant time period under *Matter of Raquel Marie X.* for determining whether the biological father manifested an intention to assume custody of the child is confined to the pregnancy as of November 2003 to the child's birth on April 1, 2004 and to the surrender that occurred a mere two days after the birth. Several events that occurred during that time frame, or which failed to occur, lead me to conclude that the biological father falls short of meeting the requirements established by the Court of Appeals for him to be deemed a "consent father."

The first event was a meeting between the families of the birth mother and the biological father in November of 2003. The meeting was conducted at the home of the biological father, and was secretly videotaped by a member of his family. The purpose of the meeting, according to the biological father, was "to clarify that [he] did not [forcibly] rape [Tenisha]," as the maternal grandmother and her church pastor had stated that he could be arrested for rape. The paternal grandmother also testified that the purpose of the meeting was to discuss rape. Efforts were made by the biological father's family, while the videotape was rolling, to secure the birth mother's recantation of prior allegations of forcible rape. Though the biological father could not, in fact, be prosecuted for rape because of his age (*see* Penal Law §§ 130.35, 130.30, 130.25), a fact that he and his family may not have known at that early stage of events, he was subject to criminal prosecution for sexual misconduct under Penal Law § 130.20. At no time during the families' meeting did the biological father make any statement that he wanted to parent the child, according to both his own testimony, as well as that of the birth mother (*see Matter of Micah HH.,* 261 AD2d 723, 725 [1999]). The overriding concern of the biological father and his family, at that time, was penal rather than parental.

The second event during the relevant period, mentioned by the majority, was a single trip by the biological father to the birth mother's church in the hope of seeing her, since he was uncertain at that time where she was residing. The majority

misconstrues the significance of this trip. Any effort made by the biological father to see the birth mother and speak with her was not tantamount to manifesting an intention to assume custody of the child upon birth. Similarly, any desire that the biological father expressed to be present at the birth, while perhaps showing support for the birth mother, did not evidence his intention to assume custody of the child.

Third, against the backdrop of the birth mother having spoken with police and prosecutors about potential rape charges, which she ultimately decided not to pursue, and the videotaped meeting between the birth families about rape, the biological father and his family moved out of the jurisdiction, to Maryland, on January 30, 2004. A distant relocation during the pregnancy, as occurred here, is significant and has been held by this Court to be inconsistent with a manifestation by a father to assume custody of a child (*see Matter of Baby Boy C.,* 13 AD3d 619 [2004] [father denied "consent" status for, inter alia, relocating to North Carolina during pregnancy]).

Fourth, while the biological father acknowledged paternity to his own mother, he never registered, at any time, with the New York State Putative Father Registry pursuant to Social Services Law § 372-c.

Fifth, given the biological father's age and lack of income, he can be excused from any expectation of providing meaningful financial assistance for medical and pregnancy-related expenses. However, even considering the biological father's limited financial means, during the relevant period he never attempted to transmit to the child or to the birth mother, either directly or through third parties that knew the birth mother's whereabouts, so much as a stuffed animal, bib, or rattle.

Sixth, the trial court, and my colleagues in the majority, err, as a matter of law, in attributing, to the biological father, certain limited offers of assistance made by the paternal grandmother toward satisfaction of the "consent father" requirements, such as offering to provide some maternity clothes and the making of certain phone calls. In *Matter of Raquel Marie X.,* the Court of Appeals, in establishing the interim judicial criteria for evaluating unwed fathers' conduct, directed the courts to "give due weight to the remaining portions of Domestic Relations Law § 111 (1) (e)" (*Matter of Raquel Marie X.,* 76 NY2d at 408). The plain and unambiguous language of Domestic Relations Law § 111 (1) (e) provides that its factors apply to "the father, *whether adult or infant,* of a child born out-of-wedlock" (emphasis added). The language chosen by the Legislature appears to be deliberate, in focusing our attention solely upon the

father, regardless of his infancy or majority. Necessarily, the statute excludes consideration of the conduct of proxy individuals such as, in this instance, the child's paternal grandmother (*see Matter of Kyle,* 156 Misc 2d 260, 265 [1992], *affd* 195 AD2d 1014 [1993]). The involvement of the paternal grandmother, which the trial court and the majority interpret as favoring the biological father, is instead irrelevant under the plain and unchallenged language of Domestic Relations Law § 111 (1) (e), and is not interpreted as relevant by decisional authority (*see Matter of Michael E. J.,* 84 AD2d 816, 817 [1981] [visits and gifts from biological father's family is no substitute for visits and gifts from the biological father under Domestic Relations Law § 111 (6) (a)]; *cf. Matter of Michael,* 272 AD2d 618 [2000]). Moreover, the argument that the biological father should be credited with efforts of his own mother severely undercuts, and is inconsistent with, proof that he had the *"ability* and willingness to assume custody of the child" as required by the Court of Appeals in *Matter of Raquel Marie X.* (at 402; emphasis added).

Seventh, my colleagues in the majority qualify the biological father as a "consent father" on the basis of acknowledgment of paternity, efforts by the paternal grandmother to provide support such as by offering some maternity clothes, and efforts by the biological father to witness the birth which were rebuffed. The latter point regards testimony by the biological father and the paternal grandmother of an out-of-court statement by Pastor Kelly of the maternal grandmother's church that the biological father would be arrested if he were to go to the hospital to witness the birth. It was error for the trial court to rely on this piece of evidence as a principal basis for its determination. Assuming its admissibility into evidence not for its truth, but to explain the biological father's state of mind in reacting to the pastor's statement (*see generally* Prince, Richardson on Evidence § 8-106 [Farrell 11th ed]), the biological father nevertheless testified that had he known where the birth occurred, he would have tried visiting the birth mother anyway (*accord Stephenson v Hotel Empls. & Rest. Empls. Union Local 100 of AFL-CIO,* 14 AD3d 325, 341 [2005], *affd* 6 NY3d 265 [2006]). Thus, the biological father's efforts were not subject to any meaningul threats, and such evidence does not support the trial court's finding that he was prevented from fulfilling the expectations of the constitutional portions of Domestic Relations Law § 111 (1) (e) and *Matter of Raquel Marie X.*

None of the seven circumstances discussed above, standing alone, would warrant a finding that the biological father fails to qualify as a "consent father" in this proceeding. However, all of

these seven circumstances, viewed collectively, divest him of "consent father" status.

The majority relies upon this Court's decision in *Matter of Kiran Chandini S.* (166 AD2d 599 [1990]), to support its position that the biological father did not waive any custody rights because his family's alleged efforts to help the birth mother were declined and he was not informed of the birth until the child had already been surrendered for adoption. That case is easily distinguishable on its facts. The reason why the father in *Matter of Kiran Chandini S.* did not himself assume custody was because he did not believe that the birth mother would place the child for adoption. Here, the testimony of the biological father evidences his understanding, as early as November 2003, that the birth mother was not going to raise the child. Despite that knowledge, the biological father moved to Maryland, failed by his overall conduct during the relevant period to manifest any ability or willingness to assume custody over the child,* and did not promptly or actually file petitions to establish paternity or obtain custody of the child until after the child had been placed for adoption. These facts do not support a finding that the biological father qualifies as a "consent father" (*see Matter of Nicholas X.R.*, 246 AD2d 311 [1998]).

Assuming that the issue of the birth mother's extrajudicial surrender of the baby was properly before the trial court in its role as parens patriae over the birth mother, who was herself a minor, the surrender was properly annulled by the Family Court. However, given the birth mother's consistent and continuous assertion that she would, under such circumstances, merely re-execute an enforceable surrender, she should be permitted the opportunity to do so (*see* Social Services Law § 384 [1] [c]; 2 [a]-[b]).

Finally, as noted by the majority, the Legislature has failed for 17 years to amend Domestic Relations Law § 111 (1) (e) since the Court of Appeals rendered its decision in *Matter of Raquel*

---

* The biological father returned to New York after the child was born and only then filed custody and paternity petitions. He was ultimately adjudicated the father in October 2004 and granted supervised visitation with the child in January 2005. While the post-surrender time period is not relevant to the issue of whether or not an unwed biological father of a child under six months old has gained a protected interest in that relationship, entitling him to consent to or veto an adoption (*see Matter of Raquel Marie X.*), it is noteworthy that even after he was awarded supervised visitation with the child in 2005, the biological father's visits were, at best, unreliable and sporadic, with less than 50% attendance, thereby indicating a lack of any serious interest in forming a full father-child relationship (*see Matter of Baby Girl U.*, 224 AD2d 869, 870 [1996]).

*Marie X.* This split bench evidences the disservice to families within the state occasioned by the Legislature's failure to act.

Since the biological father has not satisfied the criteria set forth in *Matter of Raquel Marie X.,* in that he failed during the relevant six-month period preceding the child's placement for adoption to promptly assert his willingness and ability to assume custody of the child, I respectfully dissent from the portion of the majority's decision which concludes otherwise. While this appeal does not lend itself to easy solution, the more proper result under the facts and applicable law is to reverse the order dated June 30, 2006, denying the petition, stay any transfer of custody of the child to any other person for a period of 90 days pending the birth mother's execution of a new and valid judicial surrender of the child, grant the petitioners Mr. Anonymous and Mrs. Anonymous leave to file an amended petition for adoption within those 90 days, and direct the Family Court to make a determination on the amended petition thereafter, without requiring the consent of the biological father.