Filed 5/23/13  Adoption of Baby Boy R. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| Adoption of BABY BOY R., a Minor. | 2d Juv. No. B244641<br>(Super. Ct. No. A016677)<br>(Ventura County) |
| R.G., et al.,<br><br>    Plaintiffs and Respondents,<br><br>v.<br><br>A.M.,<br><br>    Defendant and Appellant. | |

In *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*), our Supreme Court articulated what an unwed father must do to elevate himself to the status of a "presumed father" and thereby preclude termination of his parental rights. Three years after *Kelsey S.* was decided, the court made clear that an unwed father's burden arises immediately upon learning of the pregnancy and requires "a full commitment to his parental responsibilities - emotional, financial, and otherwise . . . ." (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1055 (*Michael H.*).)  Here we conclude there is substantial evidence that the unwed father did not, with alacrity, make such a full commitment.

A.M., the unwed father of infant Baby Boy R. (now Ian), appeals the trial court's finding that he failed to meet his burden of proving he is a presumed father under *Kelsey S.* We conclude that substantial evidence supports the court's finding. Accordingly, we affirm the judgment terminating appellant's parental rights to Ian and freeing the child for adoption by respondents R.G. and C.G. (Fam. Code, § 7662 et seq.)[1]

FACTS AND PROCEDURAL HISTORY

Ian was born on Staten Island, New York, in October 2011. Appellant is Ian's natural father. The biological mother is M.R., who is not a party to this appeal. Ian was conceived after appellant and M.R. met at a nightclub around January 1st of 2011. The two had sex the night they met, then had sex again about two weeks later. At the time, appellant was on parole from a 10-year New York state prison term for first degree manslaughter.[2] Less than a month after Ian's birth, appellant was returned to prison on a parole violation and has remained incarcerated throughout these proceedings.

In February of 2011, M.R. sent appellant a text message informing him that she was pregnant. Appellant had suspected that M.R. might have gotten pregnant because his condom broke while they were having sex. Appellant texted M.R. and asked to see the results of her pregnancy test. M.R. responded that she would have the results delivered to him. Shortly thereafter, M.R. sent appellant a text stating that she was planning on having an abortion.

On May 19, 2011, M.R. sent appellant a text stating, "I thought u should know i abortd." Appellant responded, "How do i kno u lyin? I really care if u have it. L-O-L i mean i don't." M.R. replied, "its gone no lie" and appellant asked, "4 months n u abort?" Appellant asked M.R. to meet him the following day. M.R. initially agreed, but

---

[1] All further statutory references are to the Family Code unless otherwise specified.

[2] We deny respondents' opposed request for judicial notice of the court decisions affirming appellant's conviction and denying his petition for a writ of habeas corpus. Aside from the fact that judicial notice was not requested below, the facts underlying appellant's conviction are not pertinent to the issues raised on appeal.

changed her mind. Appellant did not go to M.R.'s house because he knew she had a boyfriend and that M.R. did not want him to come. With regard to M.R.'s claim that she had an abortion, appellant "thought the whole time that she was just lying to me and she was trying to, like, you know, keep me close to her or something."

Appellant's mother testified that appellant tried to get in touch with M.R. through a cousin who knew her, but the cousin did not know where she lived. According to appellant, he tried to call M.R. and discovered that her telephone had been disconnected. He testified that he also unsuccessfully tried to find her on the internet. Immediately after Ian's birth, however, appellant's aunt was able to contact M.R. on Facebook and M.R. forwarded her telephone number.

M.R. had arranged for Ian's adoption prior to his birth. Two hours after the child was born, he was placed in the care and custody of respondents and has remained with them ever since. M.R. signed an independent adoption placement agreement and waiver of the right to revoke consent, which rendered the agreement irrevocable as of October 13, 2011.

M.R.'s declaration stated that she did not presently recall the name or address of the child's father, with whom she had a "one-night stand" after meeting at a New Year's Eve party. M.R. subsequently identified a third party, her then-current boyfriend Merv G., as the possible biological father. On October 14, 2011, respondents served Merv G. with a section 7662 notice.[3]

Respondents remained with Ian in New York until October 20, 2011, when they received clearance from ICPC (Interstate Compact on Placement of Children) authorities to return with the child to their home in California. On October 26, 2011, respondents filed their adoption request in the instant action and the matter was assigned to Judge Tari Cody.

---

[3] The notice informed Merv G. that his parental rights to the child would be terminated pursuant to section 7664 without further notice unless he brought an action to declare the existence of a parent-child relationship within 30 days, as contemplated in section 7630. Merv G. took no action.

About a week after Ian's birth, appellant's aunt informed him that M.R. had placed the child for adoption. Appellant testified that M.R. also sent him an email with her telephone number. When he called, she informed him that he "had something like 15 days to terminate the adoption or do something about it." M.R. gave appellant her attorney's telephone number and the telephone number for respondents' attorney. On or about October 26, 2011, appellant filed a filiation petition in New York and summons was issued to M.R. and respondents. Respondents were never served, however.

On November 2, 2011, respondents personally served appellant with a Notice of Alleged Paternity (§§ 7662-7669) in the instant action, informing him that the court would proceed without his consent unless he took immediate action pursuant to section 7630. The following day, appellant wrote to Judge Cody stating that he wanted to take further action to obtain custody of Ian and asking what steps he had to take in order to do so. Appellant also requested a paternity test. That same day, appellant was returned to custody for violating his parole.[4]

On November 6, 2011, Judge Cody sent a letter to appellant informing him that the court could not give him advice and suggesting that he contact an attorney. On November 24, 2011, appellant wrote Judge Cody and asked the court to appoint him an attorney.

On December 5, 2011, respondents filed petitions to terminate the parental rights of appellant and Merv G., premised on their belief that neither of them had brought an action to establish a parental relationship pursuant to section 7630 within the requisite 30-day period. On January 12, 2012, the court terminated Merv G.'s rights, appointed counsel for appellant, and granted appellant's request for a paternity test. That same date,

---

[4] Appellant testified that his parole was violated after he was picked up at around 4:00 a.m. for breaking his curfew. According to appellant, he was on his way to a 6:00 a.m. appointment for a job at a pizzeria and simply "didn't contact [his] parole officer and inform him beforehand."

respondents filed a petition to determine or terminate appellant's parental rights and determine whether his consent to adoption was necessary pursuant to section 7664.[5]

On February 7, 2012, the New York filiation petition was dismissed without prejudice after appellant failed to appear for a second time. Appellant did not appeal the order of dismissal.

The hearing on respondents' section 7664 petition was held on September 28, 2012. Appellant was allowed to testify by telephone from prison. Appellant's mother also testified on his behalf.

At the conclusion of the hearing, the trial court found that appellant had failed to meet his burden of showing he promptly came forward and demonstrated a full commitment to parenting Ian as contemplated in *Kelsey S.*, such that the child could be freed for adoption without appellant's consent. The court reasoned: "[T]here really isn't much to show once he knew that this woman was pregnant that he took any effort, other than realizing her phone now may have changed, to locate her and to assume his rights as a father. I realize that's not easy to do in circumstances where you don't have a relationship with a woman with whom you've had . . . sexual relations, but I would have expected more, some attempt. Where is she? How do I find her? I don't know anybody, but I've contacted X, Y, and Z to see if I can find her because if she's carrying my child I want to know. I don't see that that effort was made between February and May. [¶] Then in May, although he was informed . . . that she had had an abortion, his testimony was he wasn't sure. He didn't know whether to believe her or not. But he . . .

---

[5] Section 7664 provides in pertinent part: "(b) If the natural father or a man representing himself to be the natural father claims parental rights, the court shall determine if he is the father. The court shall then determine if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed. The court, in making that determination, may consider all relevant evidence, including the efforts made by the father to obtain custody, the age and prior placement of the child, and the effects of a change of placement on the child. [¶] (c) If the court finds that it is in the best interest of the child that the father should be allowed to retain his parental rights, the court shall order that his consent is necessary for an adoption. If the court finds that the man claiming parental rights is not the father, or that if he is the father it is in the child's best interest that an adoption be allowed to proceed, the court shall order that the consent of that man is not required for an adoption. This finding terminates all parental rights and responsibilities with respect to the child."

didn't testify that he made the efforts I would have expected to confirm whether that had happened." The court concluded that instead of trying to find M.R., appellant "was waiting for her to contact him. And then when he couldn't get her to respond immediately to meet with him, his efforts stopped."

The court further reasoned that although appellant made efforts to demonstrate his commitment to Ian after the child's birth, "he [then] did the worst of all possible things, which is he violated his parole and . . . his efforts then ended when he got arrested. . . . [T]here's no way that he could have continued to satisfy *Kelsey S.* once he made a decision to violate parole, which I'm sure he was aware of." The court deemed the case analogous in this respect to *In re Adoption of O.M.* (2008) 169 Cal.App.4th 672 (*O.M.*), in that father "seeks to obtain only legal custody while relegating physical custody to his parents until he is released from a lengthy incarceration. And that does not serve the interest in stability and continuity in a child's family life, which is a very important public policy under *Kelsey S.* and, frankly, all California law that I'm aware of." The court then proceeded to terminate appellant's parental rights and allow the adoption to proceed without his consent. Appellant timely appealed.

DISCUSSION

Appellant contends the court erred in terminating his parental rights to Ian and allowing the child to be adopted without his consent. He claims he should be conferred the status of a presumed father under *Kelsey S.* He further argues that the relevant statutory procedures as codified in the Family Code "can impermissibly interfere with the unwed father's constitutional rights particularly if he is required to take certain critical steps to protect his rights without being afforded the assistance of counsel" and that "[t]his is one such case." We are not persuaded.

The parental rights of an unwed father depend substantially on whether he qualifies as a "presumed father" under section 7611. (*Michael H., supra*, 10 Cal.4th at pp. 1050–1051.) A natural father is one whose paternity has been established but who does not qualify as a presumed father. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449, fn. 15; *Kelsey S., supra*, 1 Cal.4th at p. 823, fn. 3.) A child having a presumed father

6

cannot be adopted unless the presumed father consents, regardless of the child's best interests. (*Kelsey S.*, at p. 825; § 8604, subd. (a).) By contrast, "[a] natural father's consent to an adoption of his child by third parties is not required unless the father makes the required showing that retention of his parental rights is in the child's best interest." (*Kelsey S.*, at p. 825; § 7664, subd. (b).)

When a mother relinquishes a child for adoption or consents to adoption, an identified natural father must be given notice. (§ 7664, subd. (a).) If the natural father claims parental rights, the court must determine "if it is in the best interest of the child that the father retain his parental rights, or that an adoption of the child be allowed to proceed." (*Id.* subd. (b).) "If the court finds that the man claiming parental rights is not the father, or that if he is the father it is in the child's best interest that an adoption be allowed to proceed, the court shall order that the consent of that man is not required for an adoption. This finding terminates all parental rights and responsibilities with respect to the child." (*Id.* subd. (c).)

In *Kelsey S.*, our Supreme Court recognized that the equal protection and due process clauses of the United States Constitution guarantee an unwed, natural father the right to withhold consent to an adoption if he meets certain conditions. "If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent." (*Kelsey S., supra*, 1 Cal.4th at p. 849.) A court should consider all factors to determine whether an unwed, natural father's parental rights are entitled to constitutional protection. (*Ibid.*) "The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.' [Citation.] A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate

7

with his ability to do so, and prompt legal action to seek custody of the child." (*Ibid.,* fn. omitted; *Michael H., supra*, 10 Cal.4th at p. 1060.)

We apply the substantial evidence test to the trial court's determination that appellant was not entitled to the rights of a presumed father under *Kelsey S.* (*O.M., supra,* 169 Cal.App.4th at pp. 679–680.) In applying the substantial evidence test, we view the evidence in the light most favorable to the trial court's findings. (*In re A.A.* (2003) 114 Cal.App.4th 771, 782.) We resolve all conflicts in the evidence and draw all reasonable inferences in favor of the judgment and do not reweigh the evidence. (*Ibid.*) "To the extent that the issue is a mixed question of law and fact, we exercise our independent judgment in measuring the facts against the applicable legal standard." (*O.M.,* at p. 680.)

Substantial evidence supported the trial court's finding that appellant was not entitled to presumed father rights under *Kelsey S.* Appellant's arguments to the contrary ignore the applicable standard of review. In its lengthy ruling, the court noted that appellant had made at most a nominal effort to communicate with M.R. after discovering she was pregnant. Appellant offers M.R.'s statement that she was having an abortion as an excuse for his lack of initiative, yet the court credited appellant's own testimony that he did not believe M.R. when she said this. And even if he did, he told M.R. he did not care about the child or whether she aborted it. The credibility of his assertion that he made reasonable efforts to contact M.R. was also undermined by the fact that his aunt was able to contact M.R. on Facebook immediately after Ian was born. In addition to the complete lack of emotional support, appellant failed to demonstrate any financial commitment to the child. He also violated his parole shortly after Ian was born, thereby rendering it impossible for him to care for the child. These facts weigh heavily in favor of the court's finding that appellant had failed to meet his burden of demonstrating a

prompt and complete commitment to parenting Ian, and thus did not qualify as a presumed father whose consent was a prerequisite to the child's adoption.**6**

Case law is in accord. In *Michael H.,* the natural father initially suggested the mother have an abortion and agreed that the child should be placed for adoption. The father offered no support to the mother during her pregnancy. After the child was born, however, the father's commitment to parenting the child was "nothing short of impressive." (10 Cal.4th at p. 1053, fn. omitted.) The trial court found that the father's subsequent efforts were sufficient to render him a presumed father under *Kelsey S.*, and the Court of Appeal affirmed. (*Id.* at pp. 1053-1054.) In reversing, the Supreme Court reasoned in part: "It can scarcely be disputed that prenatal care is critically important to both the mother and the child. [Citations.] To the extent the mother needs such critical assistance and the unwed father is able to provide it, the father, as one of the two individuals responsible for the pregnancy, should be encouraged to do so early on and should not be granted constitutional protection after birth if he has failed to timely fulfill this responsibility. Indeed, if unwed fathers are not encouraged to provide prenatal assistance when they are able to do so, the burden will often shift to the state and therefore to society generally. [Citation.] [¶] Furthermore, if an unwed father is permitted to ignore his parental role during pregnancy but claim it after birth, it will often be very difficult to know with certainty whether he will be able to successfully contest an adoption until after the child is born. This uncertainty could well dissuade prospective adoptive parents from attempting to adopt the children of unwed mothers who, like Stephanie, have chosen for whatever reason not to keep their child and raise it

---

**6** In his opening brief, appellant makes the unsupported assertion "that he attempted to contact [M.R.] in the late/winter and early spring of 2011 to learn if she were pregnant after he was made aware of the possibility that she was pregnant." The record reflects it was M.R. who contacted appellant.

themselves.  And that result would frustrate the state's clear interest in encouraging such adoptions and providing stable homes for children.  [Citations.]"  (*Id.* at pp. 1055-1056.)

In *O.M.,* the natural father (B.R.) contended that his efforts to maintain contact with the mother (L.T.) and gain legal custody of the child after the child's birth were thwarted by L.T.'s refusal to see B.R. after she had been pregnant for several months.  Shortly after the child was born, B.R. was sentenced to prison for crimes he committed a month prior to the child's birth.  B.R. also spent time in custody for parole violations during the mother's pregnancy.  B.R. objected to the child's adoption and offered that his parents would take care of the child until the father was released from prison.  (169 Cal.App.4th at pp. 676-677.)

In affirming the trial court's finding that B.R. did not qualify as a presumed father as contemplated in *Kelsey S.* and *Michael H.*, the Court of Appeal in *O.M.* reasoned among other things that "L.T.'s refusal to communicate with B.R. played only a relatively small role in his failure to qualify for *Kelsey S*. rights.  Far more of the responsibility lies with B.R.'s own actions in violating the law.  Thus, on the facts, this is not a case in which a biological father has become entitled to *Kelsey S.* rights by making good faith attempts to fulfill his parental responsibilities, only to have those attempts frustrated by the unilateral actions of his child's mother.  [¶]  . . . [T]he rationale underlying the *Kelsey S.* requirements, and particularly the need for timely provision to unwed mothers of 'emotional, financial, medical or other assistance during pregnancy' [citation], militates against affording *Kelsey S.* rights to a biological father who has precluded himself from even attempting to provide such support, through his own voluntary involvement in criminal behavior."  (*O.M., supra*, 169 Cal.App.4th at p. 681.)  The court further explained "that in order to be entitled to equal protection of his parental rights, an unwed father must, '[i]n particular . . . , demonstrate "a willingness *himself* to assume *full* custody of the child—not merely to block adoption by others."  [Citation.]'

10

[Citation.] In the present case, B.R. does not seek to assume full custody of O.M. himself. Rather, he seeks to obtain only legal custody, while relegating physical custody to his parents until he is released from his present lengthy incarceration. Such a result would not serve the interest in 'stability and continuity in a child's family life,' which has also been identified as an important public policy in the *Kelsey S.* context. [Citation.]" (*Ibid.*)

Appellant is in no better position than the natural fathers in *Michael H.* and *O.M.* Like the father in *Michael H.*, he did not provide any financial or emotional support to the mother during her pregnancy. Appellant highlights the fact that M.R. told him she was having an abortion, yet he acknowledged he did not believe her and the court effectively so found. Moreover, substantial evidence supports the court's finding that appellant made little if any effort to maintain contact with M.R. during her pregnancy. Because he made no meaningful effort to assume his parental responsibilities until after Ian was born, the court correctly found he does not qualify as a presumed father. (*Michael H., supra*, 10 Cal.4th at pp. 1055-1056.)

Here, as in *O.M.*, "the father's ability to demonstrate his commitment [to the child] was impeded to a far greater extent by the predictable consequences of his own criminal activity" rather than the mother's actions. (*O.M., supra*, 169 Cal.App.4th at p. 675.) As the trial court explained with regard to appellant, "there's no way that he could have continued to satisfy *Kelsey S.* once he made a decision to violate parole, which I'm sure he was aware of." Appellant nevertheless claims that his incarceration should not be determinative because "there is no 'go to prison, lose your child' provision in the law." The court in *O.M.* effectively disposed of this claim as follows: "We acknowledge that a number of juvenile dependency cases . . . have upheld the rights of incarcerated parents to retain legal custody of their children if they can arrange for their children's care during

11

their incarceration. None of these cases, however, has held that a father who has never been in a position to form a bond with his child in the first place, due to his incarceration, should be relieved from the requirements that fathers must meet in order to be entitled to *Kelsey S.* rights." (*O.M., supra*, 169 Cal.App.4th at pp. 681-682.)[7]

Appellant argues that "[t]he California scheme used in this case simply places too high a burden on indigent and incarcerated fathers to protect their parental rights. Unless they move heaven and earth and everything in between, they will lose their children if the children's mother acts first especially if she lies and uses deceptive practices." According to appellant, "it is a 'damn the torpedoes, full speed ahead' attitude towards adoption in this state. If an unwed mother wants to give up her child for adoption, there is almost nothing the unwed father can do to prevent it, especially if he is indigent and/or incarcerated; he and his rights are literally 'tossed under the bus.'" To the extent appellant asserts that the procedure outlined in *Kelsey S.* fails to comport with due process, principles of stare decisis preclude us from reaching such a conclusion. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, it is simply inaccurate to suggest that a natural father is at the mercy of the mother in this context. If a father can demonstrate he would have promptly assumed his parental responsibilities but for the mother's efforts to thwart him, he is entitled to presumed father status. (*Kelsey S., supra*, 1 Cal.4th at p. 849; *O.M., supra*, 169 Cal.App.4th at p. 675.) The court found such was not the case here, and substantial evidence supports that finding.

To the extent appellant makes an as-applied constitutional challenge, the

---

[7] The court in *O.M.* distinguished *In re Monica C.* (1995) 31 Cal.App.4th 296, which appellant also cites in his brief, on the ground that it involved a mother who gave birth while incarcerated. As the court explained, "the mother had physical custody of the child for most of a year between the date of her release and the date she was incarcerated for a third time, albeit with a four-month interruption due to a second, interim, incarceration." (*O.M., supra*, at p. 682.) Appellant, liked the father in *O.M.*, never had physical custody of the child.

claim was not raised below and is thus forfeited. (*Niles Freeman Equipment v. Joseph* (2008) 161 Cal.App.4th 765, 788.) In any event, the claim fails on the merits. Appellant was given a full and fair opportunity to assert his rights. While he complains that those rights "cannot be undermined by some quick sleight-of-hand maneuvers that transfer the matter from the state wherein the parents lived, conceived and gave birth to the child," he fails to explain how his rights were so undermined. The court appointed counsel to represent him and allowed him to testify telephonically. Appellant alludes to ineffective assistance of counsel, yet offers no basis for us to make such a finding. Appellant filed his own paternity action in New York, but that action was dismissed without prejudice after appellant failed to appear or serve the parties.[8] Moreover, he appeared in the California proceedings without making any jurisdictional objections. While he claims "he had every expectation that the paternity action would be heard in California but it was not," the claim *was* heard, albeit not in the context or manner in which he may have preferred.[9] Respondents also note that New York law is essentially in accord with California law with regard to an unwed father's right to block an adoption. (See, e.g., *Matter of Raquel Marie X.* (1990) 76 N.Y.2d 387, 402 [New York law requires consent to adoption from the father of a child born out of wedlock and placed for adoption at less than six months of age only if the father has "promptly" asserted his interest and "manifest[ed] his ability and willingness to assume custody of the child"]; *Adoption of*

---

[8] The dismissal order, of which we take judicial notice at appellant's request, states that "the petition is dismissed because it is duplicative with California case . . . ." Appellant did not appeal the order.

[9] When a proceeding has been initiated to determine a natural father's rights under section 7662, any action brought to establish paternity under section 7630 is consolidated with the proceeding and "[t]he parental rights of the alleged natural father shall be determined as set forth in Section 7664." (§ 7630, subd. (d)(2).)

13

*Kyle* (1992) 592 N.Y.S.2d 557, 560["[t]o allow a[n incarcerated] father to simply provide for the care of his child by means of delegating his custodial responsibility to another, is, in effect acting only to block the adoption"].)  Appellant simply offers no basis for us to disturb the trial court's ruling in favor of respondents.

DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.[10]

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

---

[10] California Rules of Court, rule 8.278(a)(1) provides that "the party prevailing in the Court of Appeal in a civil case other than a juvenile case is entitled to costs on appeal."  Rule 8.400 defines juvenile appeals as (1) "Cases under Welfare and Institutions Code sections 300, 601, and 602"; (2) "Actions to free a child from parental custody and control under Family Code section 7800 et seq.;" and (3) "Writ petitions under Welfare and Institutions Code sections 366.26 and 366.28."  This case does not qualify as a juvenile appeal because it arose as an adoption matter under Family Code section 7600 et seq., not a freedom from parental custody matter.  In the interest of justice, however, we conclude that the parties should bear their own costs.

Tari L. Cody, Judge

Superior Court County of Ventura

_____

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Law Office of Gradstein & Gorman, Jane A. Gorman and Seth F. Gorman for Plaintiffs and Respondents.